Addie T. COLEMAN, William H. Harrison, and James L. Dixon, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

GENERAL MOTORS ACCEPTANCE CORP., Defendant.

No. 3:98–0211.

United States District Court,
M.D. Tennessee,
Nashville Division.

Jan. 14, 2004.

Clinton W. Watkins, Brentwood, TN, Michael E. Terry, Nashville, TN, Daniel L. Berger, Seth Lesser, Darnley Stewart, Leah Guggenheimer, Bernstein, Litowitz, Berger & Grossmann, LLP, New York City, Stuart Rossman, Gary Klein, Grant & Roddy, Boston, MA, Wyman O. Gilmore, Jr., Gilmore Law Office, Grove Hill, AL, for plaintiffs.

Brigid M. Carpenter, Cynthia J. Cutler, Baker, Donelson, Bearman & Caldwell, Nashville, TN, Stephen G. Anderson, Andrew L. Colocotronis, Baker, Donelson, Bearman, Caldwell & Berkowitz, PC, Knoxville, TN, John Thomas Hickey, Jr., Renee Deborah Honigberg, Elli Leibenstein, Thomas E. Dutton, Kirkland & Ellis, Chicago, IL, Peter N. Cubita, Joseph William Gelb, Jay N. Fastow, Weil, Gotshal & Manges, New York City, Anne Price Fortney, Markus Bruce Heyder, Lovells, Washington, DC, Scott David Lassetter, Stacy Stanley Russell, John B. Kinchen, Weil, Gotshal & Manges, LLP, Houston, TX, James Robert Bruinsma, Dykema Gossett, PLLC, Chicago, IL, John Thomas Feeney, III, Feeney & Murray, PLLC, Nashville, TN, for defendants.

## MEMORANDUM

TRAUGER, District Judge.

Pending before the court is the Motion for National Class Certification (Docket No. 537) filed by the plaintiffs Addie T. Coleman, William H. Harrison, and James L. Dixon, on behalf of themselves and all others similarly situated, to which defendant General Motors Acceptance Corporation ("GMAC") has responded (Docket No. 550), plaintiffs have replied (Docket No. 574), and defendant has filed a sur-reply (Docket No. 595).

### Factual Background and Procedural History

Plaintiffs seek to bring this suit on behalf of themselves and "all black consumers who obtained financing from GMAC in the United States pursuant to GMAC's 'Retail Plan—Without Recourse'[1] between May 10, 1989 and the date of judgment." (Docket No. 437, Seventh Amended Class Action Complaint ¶ 130.)

To summarize briefly the facts of this case, which has been pending since 1998, the plaintiffs allege that GMAC utilizes a retail credit pricing system in which there are two components to the annual percentage rate ("APR") set in its retail installment sales contracts: the buy rate and the finance charge markup.[2] The buy rate is the portion of the APR that is the risk-related interest rate that GMAC requires to be charged for a particular transaction. The finance charge markup is the non-risk charge, added to the buy rate by the dealer, that must not exceed a limitation set by GMAC's policy. According to the plaintiffs, there are incentives in GMAC's retail finance system to encourage imposition of the subjective non-risk-related markup by automobile dealers, who act as GMAC's agents in negotiating the final credit terms of the retail installment sales contract eventually executed by the consumer. Plaintiffs claim that GMAC's markup policy, as implemented by the dealers with whom it contracts, causes black consumers to pay higher average finance charges than similarly-situat-

---

**1.** As defined by the plaintiffs, the phrase "[w]ithout recourse" refers to the situation whereby GMAC, as the assignee of the automobile financing transaction, cannot require payment by the automobile dealer in the event that the consumer defaults on the financing agreement. (Docket No. 437 ¶¶ 33–35, 41.)

**2.** Unless otherwise noted, all facts have been drawn from plaintiffs' Seventh Amended Class Action Complaint. (Docket No. 437.)

ed white consumers and that this disparate impact violates the Equal Credit Opportunity Act ("ECOA").

In November 1998, Judge Campbell, to whom this case was initially assigned, denied GMAC's first Motion to Dismiss. (Docket Nos. 42, 43.) In March 1999, this court received the case. (Docket No. 78.) In August 2000, having received extensive briefing and heard oral argument, the court granted class certification to the plaintiffs with regard to a Tennessee-based class. (Docket Nos. 276, 277.) Concurrently, the court granted in part and denied in part GMAC's Motion for Summary Judgment on the Third Amended Complaint. *Id.* The court dismissed those claims seeking to hold GMAC liable under the Federal Trade Commission's Holder in Due Course Rule but otherwise rejected GMAC's challenges to the sufficiency of the Third Amended Complaint. On interlocutory appeal, the Sixth Circuit held that the court erred in granting class certification, as the monetary relief sought by the plaintiffs in the Third Amended Complaint required individualized determinations, a fact that was fatal to class certification under Federal Rule of Civil Procedure 23(b)(2). *Coleman v. General Motors Acceptance Corp.*, 296 F.3d 443, 449 (6th Cir.2002). Upon remand, the plaintiffs amended their complaint to delete any request for monetary damages and to extend their class to be nationwide in scope. The court has since denied in part and granted in part GMAC's Motion to Dismiss it from the Seventh Amended Class Action Complaint, ordering that plaintiffs' claims seeking to hold GMAC vicariously liable for dealers' violations of the ECOA under the non-delegable duty doctrine be dismissed. (Docket No. 497.) The court has also granted GMAC's Motion to Compel Arbitration and to dismiss with respect to named class plaintiff Carolyn Dixon, terminated Carolyn Dixon as a party, and denied plaintiffs' Motion to Substitute a class representative. (Docket No. 546.)

The plaintiffs now move the court for certification of the aforementioned class.

## Discussion

### I.  Requirements for Class Certification

■ The principal purpose of class actions is to achieve efficiency and economy of litiga-

tion, both with respect to the parties and the courts. *See General Telephone Co. v. Falcon*, 457 U.S. 147, 159, 155, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). The Supreme Court has observed that, as an exception to the usual rule that litigation is conducted by and on behalf of individual named parties, "[c]lass relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" *Id.* at 155, 102 S.Ct. 2364 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–01, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979)). The Court directs that, before certifying a class, district courts must conduct a "rigorous analysis" of the prerequisites of Rule 23 of the Federal Rules of Civil Procedure. *Falcon*, 457 U.S. at 161, 102 S.Ct. 2364. The Sixth Circuit has stated that district courts have broad discretion in deciding whether to certify a class, but that courts must exercise that discretion within the framework of Rule 23. *Coleman*, 296 F.3d at 446; *In re American Medical Systems, Inc.*, 75 F.3d 1069, 1079 (6th Cir.1996).

■ Although a court considering class certification may not inquire into the merits of the underlying claim, *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974), a class action may not be certified merely on the basis of its designation as such in the pleadings, and "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Falcon*, 457 U.S. at 160, 102 S.Ct. 2364; *see also American Medical Systems*, 75 F.3d at 1079; *Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir.1974). Moreover, the party seeking class certification bears the burden of establishing its right to class certification. *See Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir.2003); *Senter v. General Motors Corp.*, 532 F.2d 511, 522 (6th Cir.1976), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976).

The party seeking class certification must first meet all four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation—before a

class can be certified. Fed.R.Civ.P. 23(a); *American Medical Systems*, 75 F.3d at 1079. "Once those conditions are satisfied, the party seeking certification must also demonstrate that it falls within at least *one* of the subcategories of Rule 23(b)."[3] *American Medical Systems*, 75 F.3d at 1079 (emphasis in the original). The court will consider each of the Rule 23(a) requirements in turn.[4] Although plaintiffs suggest, in their Amended Complaint, that certification is appropriate under Rule 23(b)(3) as well as under Rule 23(b)(2), (Docket No. 437 ¶ 133), their Memorandum in Support of their Motion for Class Certification only seeks certification under Rule 23(b)(2). (Docket No. 538 at 2.) Accordingly, following analysis of the Rule 23(a) factors, this court will analyze plaintiffs' motion for certification only as to a Rule 23(b)(2) class. Additionally, under Rule 23(c)(1)(B), as amended effective December 1, 2003, an order certifying a class action must not only define the class and class claims, issues, or defenses, but also appoint class counsel under Rule 23(g). Fed.R.Civ.P.

23(c)(1)(B), 23(g). Because the court grants plaintiffs' Motion for National Class Certification, the court will also address the requirements of Rule 23(g).[5]

## II. Rule 23(a) Analysis

### A. Rule 23(a)(1): Numerosity

■ Rule 23(a)(1) requires that the class be "so numerous that joinder of all members is impracticable." In *Senter*, the Sixth Circuit explained that there is "no specific number below which class action relief is automatically precluded" and that it is the circumstances of the case, not a strict numerical test, that determines impracticability of joinder. *Senter*, 532 F.2d at 523 n. 24. The plaintiffs allege that they meet the numerosity requirement based on projections from statistics garnered as part of a 1999 GMAC study. (Docket No. 437 ¶ 131.a.) As part of that study, GMAC produced electronic data concerning all finance transactions originated by three Tennessee dealer arrangers/originators between January 1,

3. Rule 23(b) provides that a class action may be maintained if, in addition to the requirements of Rule 23(a):
   (1) the prosecution of separate actions by or against individual members of the class would create a risk of
   (A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or
   (B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or
   (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or
   (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the

claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.
Fed.R.Civ.P. 23(b).

4. In its prior decision on class certification, this court found that the plaintiff class met each of the four prerequisites for class certification under 23(a). (Docket No. 276 at 9.) The Sixth Circuit in *Coleman* did not consider the court's Rule 23(a) analysis in its reversal of this court's previous ruling: "Because we hold that the proposed class violates the requirements of Rule 23(b)(2), we will not address the question of whether plaintiff meets the 23(a) requirements." *Coleman*, 296 F.3d at 446. The plaintiffs now seek to rely on this court's earlier analysis and decision as to the Rule 23(a) requirements as the law of the case. (Docket No. 538, Plaintiffs' Memorandum of Law in Support of Motion for Class Certification at 19.) Because the plaintiffs are now relying on the Seventh Amended Class Action Complaint, with adjustments to the class definition and representation, the court will again conduct a rigorous analysis of the plaintiffs' compliance with the Rule 23(a) requirements of numerosity, commonality, typicality, and adequate representation, despite plaintiffs' invocation of the discretionary law of the case doctrine.

5. None of the other recent amendments to the Federal Rules of Civil Procedure are implicated by the court's analysis of plaintiffs' motion.

1995 and December 31, 1998, amounting to 6,890 finance accounts (5,050 of which could be race-coded). (Docket No. 437 ¶¶ 62, 63.) Of the 5,050 accounts in that three-year period, 775 of the primary buyers were black. *Id.* at ¶ 64. Relying on this Tennessee-based data, in conjunction with the nature of the commerce involved and GMAC publications, the plaintiffs estimate a nationwide class exceeding 100,000–125,000 class members. (Docket No. 437 ¶ 131.a; Docket No. 537 ¶ 2(a).) Plaintiffs have established that their proposed class is sufficiently numerous to be impracticable for joinder. Furthermore, the defendant does not dispute numerosity here. The numerosity requirement is satisfied.

## B.  Rule 23(a)(2): Commonality

Plaintiffs must also show that "there are questions of law or fact common to the class" under Rule 23(a)(2). A leading treatise characterizes the commonality prerequisite as correlative with the numerosity prerequisite and has designated the two together as the conceptual basis of whether a matter is properly adjudicated using the class action device. *See* Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 3:10 (4th ed.2003) (hereinafter "Newberg"). The Sixth Circuit has characterized this commonality requirement as "qualitative rather than quantitative" and observed that there need be only one issue common to all members of the class. *American Medical Systems, Inc.*, 75 F.3d at 1080 (citing 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3:10 (3d ed.1992)). However, the Court has observed that not every common issue will satisfy this requirement, and to do so, the common issue must be one the resolution of which will advance the litigation. *Sprague v. General Motors Corporation*, 133 F.3d 388, 397 (6th Cir.1998), *cert. denied*, 524 U.S. 923, 118 S.Ct. 2312, 141 L.Ed.2d 170 (1998).

The representative plaintiffs argue that there are questions of law and fact common to the entire class that predominate over questions affecting only individual members of the class. (Docket No. 537 ¶ 2.(b).) They assert that there are no individual issues on the question of liability. Specifically, the plaintiffs identify seven legal and factual issues that are common to each proposed class member as follows: (1) whether GMAC's subjective credit pricing policy is a specific, facially neutral credit pricing practice that has effected racial discrimination in violation of the Equal Credit Opportunity Act; (2) whether there are disparities between the subjective credit charges imposed on blacks and the subjective credit charges imposed on whites pursuant to GMAC's subjective credit pricing policy; (3) if there is a racial disparity in subjective credit charges, whether it is statistically significant to a sufficient degree to indicate a causal connection between the subjective credit pricing policy and the discriminatory effect; (4) if there is a racial disparity in subjective credit charges, whether it is demonstrated by statistical evidence from an adequate, competent and relevant data set; (5) if there is a disparity, whether the disparity is due to legitimate creditworthiness differences that can be legally justified under the business necessity doctrine; (6) if there is a disparity that is legally justified under the business necessity doctrine, whether there are less discriminatory alternatives; (7) if there is a disparity that is not legally justified, what equitable relief is appropriate. (Docket No. 437 ¶ 131.b.i-vii.)

### 1.  Individualized Determinations Regarding the Actions of the Dealers and Individual Class Members' Transactions

GMAC argues that the plaintiffs cannot meet the commonality requirement because the disparities alleged by the plaintiffs are caused by the actions of individual dealers, not by a practice of GMAC. (Docket No. 550 at 10.) In support, the defendant cites a number of cases in which courts have failed to find Rule 23(a) commonality when the decisions allegedly constituting discrimination are made by regional or local decision-makers acting independently. *Id.* at 11–12. Defendant argues that the only GMAC "policy" that plaintiffs are able to identify is GMAC's purchase of contracts with subjective finance charge markups added by the dealers to the objective, non-biased rate determined by GMAC. *Id.* at 12–13. Defendant

states that the plaintiffs do not dispute that the decisionmaking that gave rise to the alleged discrimination occurred at the dealer level, and argues that the practices of each dealer must be individually evaluated to determine whether the suspect transactions result from racial discrimination at all. *Id.* at 13.

Defendant also argues that plaintiffs bear the burden of proof to show that a specific GMAC practice caused the disparity attributable to race and that the disparity did not result from other factors. *Id.* at 14. Given the number of individualized factors (e.g., educational background and understanding of credit, culture, sociological reasons, etc.) that could affect a finance charge markup (which the defendant argues even the plaintiffs' experts recognize), class treatment is inappropriate. *Id.*

■ Courts may certify class actions despite the existence of factual differences or individual considerations from person to person. In *Senter,* which involved the certification of a class action alleging that an employer had engaged in a general pattern and practice of discriminating against minority employees in its promotions policy, the employer contended that the claim should not proceed as a class action because every promotional decision involves individual considerations, which would have to be examined by a court before a finding could be entered on the Title VII issue. *Senter,* 532 F.2d at 523. The Court agreed that every decision to hire, fire, or discharge an employee may involve individual considerations, but "when that decision is made as part of class-wide discriminatory practices, courts bear a special responsibility to vindicate the policies of the Act regardless of the position of the individual plaintiff." *Id.* at 524. The Court found that the commonality prerequisite was met when the common question presented by the class was whether the employer's promotional procedures resulted in discrimination against minority employees, despite the potential for individual considerations as to the specific members of the class. *Id. See also Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1197 (6th Cir.1988) ("the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible"); *Putnam v. Davies,* 169 F.R.D. 89, 93–94 (S.D.Ohio 1996) (commonality requirement is satisfied when the class has been affected by a general policy in the form of a statutory procedure, despite the fact that there are factual differences between the members of the class); *Huguley v. General Motors Corp.,* 638 F.Supp. 1301, 1303–04 (E.D.Mich.1986) (court does not accept defendant's argument that class certification would create an unmanageable series of discrete cases when the putative class action presents the common question of whether defendant's performance appraisal system is racially discriminatory and the court found that anecdotal and statistical proof could illuminate the issue without requiring the separate examination of each class member).

Turning to cases outside the Sixth Circuit that present facts similar to the instant case, in *Ceiba, Inc. v. Ford Motor Credit Co.,* the defendant automotive financing corporations challenged the subject matter jurisdiction of Ceiba, a consortium of community-based Latino organizations, which sought to hold the financing companies accountable under the ECOA for the alleged disproportionate impact of the defendants' finance charge markup policies on Latinos. *Ceiba, Inc. v. Ford Motor Credit Co.,* No. Civ.A. 03–1402, 2003 WL 22204560, at *1 (E.D.Pa. Sept. 22, 2003). The precise issue before the district court was whether the plaintiffs had standing to bring a claim under the ECOA, but one prong of the associational standing analysis—that the nature of the claim must not require individual participation in the case—implicates many of the same arguments as the instant issue. *Id.* at *4. The court found that proving the plaintiffs' disparate impact claims would require statistical analysis and comparison between similarly creditworthy Latinos and whites, not individualized determinations. *Id.* The court distinguished the case of *Rodriguez v. Ford Motor Credit Co.,* No. 01 C 8526, 2002 WL 655679, 2002 U.S. Dist. LEXIS 7280 (N.D.Ill. Apr. 19, 2002), which had held that plaintiffs' discrimination claims could not be proven without partic-

ipation of the aggrieved persons, because *Rodriguez* had involved money damages, while Ceiba sought only declaratory and injunctive relief. *Id.* The court said:

> Creditworthiness is quantifiable and easily susceptible to comparison. Therefore, through statistical analysis and comparison of similarly creditworthy applicants, purchasing similar automobiles, within a set increment of time of one another, both Plaintiff and Defendants may prove their case without the significant participation of individual aggrieved applicants. This spares the court from engaging in case by case determinations . . . .

*Id.* In *Buycks–Roberson v. Citibank Fed. Sav. Bank,* the plaintiffs sought certification of a class of African–Americans to challenge Citibank's alleged discriminatory redlining practices in the home loan approval process under a number of legal theories, including the ECOA. *Buycks–Roberson v. Citibank Fed. Sav. Bank,* 162 F.R.D. 322, 325 (N.D.Ill. 1995). The defendant argued that commonality could not be achieved because of the significance of individual issues regarding the class members' unique financial qualifications for home loans. *Id.* at 330. The court disagreed, noting that, "where the subjective decisions of Citibank employees allowed Citibank to systematically discriminate on the basis of race or the racial composition of the applicant's neighborhood when choosing among minimally qualified applicants, common issues of law and fact exist regardless of individual differences." *Id.* The court envisioned that the plaintiffs might prove that the loan originators' subjective application of neutral underwriting criteria caused a discriminatory effect by using "expert testimony and statistical evidence showing 'disparities rather than specific incidents of discrimination' between the relevant comparison groups." *Id.* at 332 (quoting *Perez v. FBI,* 707 F.Supp. 891, 898–99 (W.D.Tex.1988)). The court was guided in its commonality analysis by prior precedent, which had emphasized that, "Especially in the context of Rule 23(b)(2) class actions, distinct factual contexts will be unified under a common claim for equitable relief." *Id.* at 329 (quoting *Cristiano v. Courts of Justices of the Peace,* 115 F.R.D. 240, 247–48 (D.Del.1987)

quoted in *Gomez v. Illinois State Bd. of Educ.,* 117 F.R.D. 394, 399 (N.D.Ill.1987)).

The defendant relies on a number of cases in which courts found that putative classes had not established commonality under Rule 23(a) for the proposition that courts are routinely unable to find common questions of law or fact, given the actions of independent regional or local decisionmakers who are purportedly acting in a discriminatory manner. (Docket No. 550 at 11.) Nearly all of the cases cited by the defendant concern alleged discrimination in the employment context. In the single case that concerned alleged discriminatory lending practices under the ECOA, *Garcia v. Veneman,* the court failed to find commonality not merely because of the number and geographic dispersion of the decisionmakers, as asserted by the defendant, but also because of the plaintiffs' failure to correlate the discrimination they alleged with subjective loan qualification criteria (which the court viewed as not entirely subjective). *Garcia v. Veneman,* 211 F.R.D. 15, 20, 22 (D.D.C.2002).

■ Several of the remaining cases are immediately distinguishable from the instant case because the plaintiffs there sought class certification with regard to disparate treatment claims only. *See Reyes v. Walt Disney World Co.,* 176 F.R.D. 654, 658 (M.D.Fla. 1998); *Zapata v. IBP, Inc.,* 167 F.R.D. 147, 159 (D.Kan.1996). The rationales of those courts, which found the putative class actions to be merely collections of highly individualized discriminatory treatment claims, are not persuasive to this court because, as one of defendant's own authorities states, "in a disparate impact claim where plaintiffs claim practices that are facially neutral in their treatment of different groups, the commonality requirement may be more easily met than in a disparate treatment case." *Wright v. Circuit City Stores,* 201 F.R.D. 526, 539 (N.D.Ala.2001). To satisfy the commonality requirement within the context of a disparate impact claim, plaintiffs must allege "a discriminatory policy or procedure of general application to the class they seek to certify." *Id.* at 540.

Many of the cases cited by the defendant are likewise distinguishable because they involved claims which concerned a jumble of different employment practices or claims, often across a spate of different facilities, not a particular policy common to all plaintiffs. *See Wright,* 201 F.R.D. at 541 (finding no identifiable pattern or practice affecting a definable class in common ways, when the claims involved multiple facilities across many states with a group of diverse and differently-situated employees challenging many different policies); *Bradford v. Sears, Roebuck & Co.,* 673 F.2d 792, 795–96 (5th Cir.1982) (finding no commonality established by plaintiffs' conclusory allegations when there was a serious question as to whether one employment scheme was used by the defendant); *Allen v. City of Chicago,* 828 F.Supp. 543, 552 (N.D.Ill.1993) (finding no commonality with respect to claims of disproportionate impact as to race/ethnicity, age, and political affiliation following reorganization of city work force when there was no general policy or practice, but only a series of individualized claims). The court in *Abrams v. Kelsey–Seybold Medical Group, Inc.* disputed the plaintiffs' attempt to submit their challenge of an employer's practice of classifying employees by race and sex to a disparate impact analysis, stating that the practice had to be analyzed as a collection of individualized claims of discriminatory treatment and as such was not susceptible to classwide adjudication. *See Abrams v. Kelsey–Seybold Medical Group, Inc.,* 178 F.R.D. 116, 131–32 (S.D.Tex.1997). And, while the court in *Bacon v. Honda of Am. Mfg., Inc.* found insufficient proof of centralized decisionmaking to support commonality with regard to plaintiffs' discriminatory treatment claims or disparate impact claim based on subjective decisionmaking, the court noted that "the plaintiffs have arguably established commonality in regard to some of their disparate impact claims" as regarded neutral employment practices. *See Bacon v. Honda of Am. Mfg., Inc.,* 205 F.R.D. 466, 478–79 (S.D.Ohio 2001).

Defendant's remaining authorities are well-taken. *Zachery v. Texaco Exploration & Prod., Inc.,* 185 F.R.D. 230, 238–39 (W.D.Tex.1999) (finding that decentralized organization led to too many different systems to make out commonality); *Appleton v. Deloitte & Touche LLP,* 168 F.R.D. 221, 231–32 (M.D.Tenn.1996) (finding insufficient evidence to support plaintiffs' assertions of uniform criteria set by national personnel office as to all types of employees). However, the court is not persuaded by this authority to find no common issues of law or fact, in the face of plaintiffs' persuasive articulation of commonality.

In contrast to many of the putative classes discussed in defendant's aforementioned authorities, the plaintiffs in this case have targeted a narrow, specific, facially neutral policy that they allege is created by a centralized decisionmaker with the power to set policy and utilized by all participating dealers who offer GMAC financing to customers, to observable discriminatory effect. (Docket No. 437 ¶¶ 15, 16, 113, 114, 126.) Plaintiffs allege that this policy is the finance charge markup policy. (Docket No. 437 ¶ 126.) Plaintiffs' claim is susceptible to statistical proof, as is standard with disparate impact claims. Plaintiffs have adduced statistical evidence to this effect in expert reports, particularly that of Dr. Mark A. Cohen, (Docket No. 503, Notice of Filing Documents), and defendant's challenges to plaintiffs' proof is now a question going to the merits, not properly before this court on a motion for class certification. Although there are certainly individual questions of fact and infinite variations in customers' interactions with specific dealers, this will not defeat commonality. The plaintiffs assert that, because this case relies almost solely on expert, statistical evidence of disparate impact and their experts have access to and can control for any conceivable credit-related factor, they can prove their case without significant participation of individual aggrieved applicants, and no individualized determinations, therefore, preclude certification of their claim for declaratory and injunctive relief. (Docket No. 538 at 24.) Proof of the representative plaintiffs' claims will advance the litigation and class certification is not precluded by individualized determinations. Plaintiffs have sufficiently asserted common issues of law and fact. It is now

their burden to prove their claims on a class-wide basis.

Defendant's further argument that plaintiffs must show that GMAC's policy caused any alleged discrimination, thereby necessitating individual fact determinations, is unavailing. (Docket No. 550 at 14.) As the defendant itself states, plaintiffs must bear the burden of proof to show that a specific GMAC practice, not other factors, caused the disparity attributable to race. *Id.* However, this is not a burden that plaintiffs must bear at this initial stage; rather, this is plaintiffs' burden at a trial on the merits. The court in *Cason* similarly viewed such factors as individual buyer characteristics, dealer characteristics, and the wide variety of pricing programs not as barriers to class certification, but as appropriate subjects for cross-examination or rebuttal. *Cason v. Nissan Motor Acceptance Corp.*, 212 F.R.D. 518, 522 (M.D.Tenn.2002). The defendant does not dispute this fact, and indeed cites this passage in its brief, portraying the *Cason* court as spared from implementing an impossible task by the settlement of the *Cason* case. (Docket No. 550 at 15.) The court is not persuaded by the defendant's line of reasoning on this point.

### 2. GMAC's Status As a Creditor

■ GMAC attacks plaintiffs' commonality on a second front. Specifically, the defendant asserts that liability under the ECOA depends on whether GMAC was a "creditor" as to each individual class member and argues that it is not a creditor with regard to those class members who purchased their cars as spot deliveries. (Docket No. 550 at 16.) Generally, GMAC defines its role in the financing process as that of a purchaser of retail installment sales contracts between auto dealers and buyers. *Id.* at 2. According

to the defendant, spot deliveries are those transactions in which a dealer signs a retail installment sales contract with the car purchaser, who takes title and possession before the dealer selects an assignee for the contract and before information about the car purchaser is sent to a potential assignee of contracts. *Id.* at 4.

The ECOA defines a "creditor" as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." [6] 15 U.S.C. § 1691a(e) (2003). The implementing regulation of the ECOA, entitled Regulation B, defines "creditor" similarly, to include (in relevant part): "a person who, in the ordinary course of business, regularly participates in a credit decision, including setting the terms of the credit. The term creditor includes a creditor's assignee, transferee, or subrogee who so participates." 12 C.F.R. § 202.2(*l*) (2003).[7]

The Official Staff Interpretations of Regulation B further elucidate what entities are considered creditors: "The term creditor includes all persons participating in the credit decision. This may include an assignee or potential purchaser of the obligation who influences the credit decision by indicating whether or not it will purchase the obligation if the transaction is consummated." 12 C.F.R. § 202, Supp. I (2003). These interpretations specifically discuss the role of automobile dealers within the context of those who make referrals to creditors and thereby bear a lesser burden under the ECOA: "For certain purposes, the term creditor includes persons such as real estate brokers, automobile dealers, home builders, and home-improvement contractors who do not participate

---

**6.** A corporation is considered a "person" for purposes of this definition. 15 U.S.C. § 1691a(f).

**7.** In a final rule dated March 18, 2003, Regulation B was amended such that the language "regularly participates in a credit decision, including setting the terms of the credit" was added to replace the previous language—"regularly participates in the decision of whether or not to extend credit"—to clarify the definition of "creditor." (Supplementary Information, Section by

Section Analysis, 68 Fed.Reg. 13144, 13145 (March 18, 2003)). Analysis of the final change makes clear that "the definition of creditor includes those who make the decision to deny or extend credit, as well as those who negotiate and set the terms of the credit with the consumer. But a potential assignee who establishes underwriting guidelines for its purchases but does not influence individual credit decisions is not a creditor." *Id.*

in credit decisions but who only accept applications and refer applicants to creditors, or select or offer to select creditors to whom credit requests can be made. These persons must comply with § 202.4(a), the general rule prohibiting discrimination, and with § 202.4(b), the general rule against discouraging applications." *Id.*[8]

The defendant contends that it cannot be a creditor as to any particular class member unless a fact finder first determines that his or her transaction was not a spot delivery. (Docket No. 550 at 16.) This argument assumes that GMAC is not a creditor under the ECOA with regard to spot delivery transactions because it did not receive any credit information about those buyers before the contract was executed or indicate whether it would purchase the obligations if they were incurred by the dealers. *Id.* The defendant asserts that inquiring into whether each class member's transaction was a spot delivery would overwhelm the action with individualized fact determinations, since whether or not a transaction is a spot delivery is not a data element captured by GMAC's systems. *Id.* at 17.

Other courts that have considered whether or not automobile financing companies are creditors within the meaning of the ECOA have found that they are, in circumstances similar to those at issue here. *See Smith v. Chrysler Financial Co.*, No. 00–6003(DMC), 2003 WL 328719, at *4–5, 2003 U.S. Dist. LEXIS 1798, at *11–14 (D.N.J. Jan. 15, 2003) (designating defendant auto financing company as an ECOA creditor in its role as assignee of retail installment contracts); *Jones v. Ford Motor Credit Co.*, No. 00 Civ. 8330(LMM), 2002 WL 88431, at *2–3, 2002 U.S. Dist. LEXIS 1098, at *7–9 (S.D.N.Y. Jan. 22, 2002) (finding defendant to be an ECOA assignee and creditor when it assigned objective credit scores to customers and authorized dealers to subjectively mark

them up). In *Osborne v. Bank of America,* this court found that the Bank of America could be deemed not merely the assignee but the originating creditor under the ECOA in regard to automobile financing contracts arranged by the dealers when:

> the Bank of America determines a customer's creditworthiness and sets the Buy Rate for the automobile loans, as well as the maximum Markup that a dealer may apply to a customer's loan. Plaintiffs further note that dealers process the loans in accordance with Bank of America's policies and procedures; that Bank of America, rather than the dealer, bears the risk of default from the moment the loan is approved; and that Bank of America compensates dealers for originating loans by rebating to them a portion of the markup.

*Osborne v. Bank of America,* 234 F.Supp.2d 804, 808 (M.D.Tenn.2002). In *Wise v. Union Acceptance Corporation,* the district court in the Southern District of Indiana considered whether the Union Acceptance Corporation ("UAC"), an entity that provided financing pursuant to retail installment automobile contracts, had discriminated against the plaintiffs under its Finance Markup Policy because of their race, in violation of the ECOA. *Wise v. Union Acceptance Corp.,* No. IP 02–0104–C–M/S, 2002 WL 31730920 (S.D.Ind. Nov. 19, 2002), at *1. The court found that UAC was an ECOA creditor as an assignee or potential purchaser of the credit obligation because "UAC works with the retail seller, sets the Buy Rate and Finance Charge Markup, provides the loan documentation, and induces the retail seller not to disclose the Finance Charge Markup to the consumer" and because it "sets the parameters, or minimum price, for what contracts it will purchase from a retail seller." *Id.* at *3. *See also Cortez v. Union Acceptance Corp.,* No. IP IP02–0105–C–M/S, 2002 WL

---

**8.** The supplementary analysis accompanying the final rule used automobile dealers as an example of those who arrange credit for others: "For example, an automobile dealer may merely accept and refer applications for credit, or it may accept applications, perform underwriting, and make a decision whether to extend credit. Where the automobile dealer only accepts applications for credit and refers those applications to

another creditor who makes the credit decision-for example, where the dealer does not participate in setting the terms of the credit or making the credit decision-the dealer is subject only to §§ 202.4(a) and (b) for purposes of compliance with Regulation B." (Supplementary Information, Section by Section Analysis, 68 Fed.Reg. 13144, 13155 (March 18, 2003))

31730922, at *2 (S.D.Ind. Nov. 19, 2002) (adopting and incorporating the discussion and rulings in *Wise*, a nearly identical lawsuit).

Neither this court in *Osborne* nor the court in *Wise* and *Cortez* relied wholly, in the determinations that the financing companies were ECOA creditors, on reasons that are distinctive to standard delivery transactions, as opposed to spot delivery transactions as they are defined by the defendant. For instance, among the practices that convinced these courts that the auto financing companies could be considered creditors are such things as the financing company's providing loan documents to dealers and the setting of buy rates and finance charge markups. These practices are most often accomplished before the finance company's evaluation of individual customers' creditworthiness, but influence the dealer's initial financing rate quote and execution of a contract with the customer. Similarly, in this case, the plaintiffs allege that GMAC participates in and influences the credit decision by practices that the court considers to be part of spot deliveries as well as standard purchases: providing GMAC financing forms and training on use of the forms, setting the buy rate and markup ranges on rate sheets (not only credit approval forms), and determining which credit applicants are subject to markup or eligible for reduced or zero markup. (Docket No. 437 ¶¶ 54a, 37, 54f.) GMAC's setting the terms and parameters of the credit decisions may be sufficient to make them a creditor for ECOA purposes.[9]

Furthermore, the court is not entirely convinced by defendant's argument that spot deliveries are consummated when the contract is initially signed, before the credit information is transmitted to, or approved by, the financing company.[10] In *Rucker v. Sheehy Alexandria, Inc.*, the district court for the Eastern District of Virginia considered whether, for purposes of compliance with the Truth in Lending Act ("TILA"), the APR of an auto purchase made on a spot delivery basis should be calculated based on the nominal date of the agreement or the actual date of its signing. *Rucker v. Sheehy Alexandria, Inc.*, 228 F.Supp.2d 711, 716 (E.D.Va.2002), *motion for reconsideration denied*, 244 F.Supp.2d 618 (E.D.Va.2003). In that case, the plaintiff had engaged in a spot delivery transaction for a car, whereby she executed a retail installment sales contract, buyer's order, and bailment agreement on April 3, 2001 under particular terms and drove the car away that day. *Id.* at 713. The buyer's order and bailment agreement made clear that the transaction was a spot delivery, because the sale was contingent upon receiving financing within five days of the agreement. *Id.* The dealer was only able to secure financing under different terms, and the plaintiff returned to the dealership on April 13, 2001 to sign a second agreement that incorporated those less favorable terms. *Id.* at 713–14. The court found that the transaction was only consummated, in accordance with the TILA, "not when the consumer takes possession of the product, but at the 'time that a consumer becomes contractually obligated on a credit transaction.'" *Id.* at 716 (quoting 12 C.F.R. § 226.2(a)(13), which is Regulation Z, the implementing regulation of the TILA). The court continued: "In sum, because [the plaintiff] did not become obligated on the credit transaction until April

---

9. Courts have found entities to be creditors for purposes of ECOA even when they did not directly review credit applications, when they regularly participated in determining binding policies for extending credit to customers. *See United States v. American Future Systems, Inc.*, 571 F.Supp. 551, 561 (Bankr.E.D.Pa.1982) (finding the chief operating officer and 97% shareholder of a company to be a creditor within the meaning of the ECOA).

10. Spot deliveries are not by their nature illegal or violative of the Truth in Lending Act. *See, e.g., Janikowski v. Lynch Ford, Inc.*, 210 F.3d 765, 769 (7th Cir.2000); *Rucker*, 228 F.Supp.2d at 719.

However, courts have noted that it is customary for dealers to make some disclosure to the customer in a spot delivery transaction that the sale is not final but subject to the approval of the financing institution. *See Pescia v. Auburn Ford–Lincoln Mercury, Inc.*, 68 F.Supp.2d 1269, 1277 (M.D.Ala.1999). And some courts have discussed spot deliveries in unfavorable terms. *See Mayberry v. Ememessay, Inc.*, 201 F.Supp.2d 687, 695 (W.D.Va.2002) (defining spot delivery transactions as a "scheme" to assure the dealership of a sale while posing the risk to the customer that the sale will fall through and require the immediate return of the car).

13, that is the date the transaction was consummated under TILA." *Id.*

The *Rucker* court's approach to spot deliveries looks beyond the moment at which the consumer takes possession of the product pursuant to a contingent contract and finds the true purchase of the vehicle to be when financing has been secured, terms have been set, and the final contract has been signed by the consumer. This approach is consonant with the approach taken by this court in *Osborne,* where the court looked beyond the terminology of the transaction and considered the true nature of the entities' roles— the financing company was integrated into the initial loan process and thus was more than an arms length assignee. *See Armstrong v. Nationwide Mortgage Plan/Trust (In re Armstrong),* 288 B.R. 404, 423 (E.D.Pa.2003) (discussing *Osborne*). Although GMAC attempts to characterize the spot delivery transaction as two distinct steps, with the credit decision being made by the dealer at the initial meeting with the customer, followed by an arms length assignment of a final contract, the plaintiffs have sufficiently alleged that GMAC participated in or influenced the credit decision for purposes of this class certification.

The court is also guided by the clear language of the Official Staff Interpretations, which defines creditors to include, for some limited purposes, "automobile dealers...who do not participate in credit decisions but who only accept applications and refer applicants to creditors, or select or offer to select creditors to whom credit requests can be made." 12 C.F.R. § 202, Supp. I (2003). This aligns with case law under which automobile dealers are held to be essentially secondary creditors subject to only limited sections of the ECOA. *See, e.g., Cannon v. Metro Ford, Inc.,* 242 F.Supp.2d 1322, 1330 (S.D.Fla.2002); *Mungia v. Tony Rizza Oldsmobile, Inc.,* No. 01 C 460, 2002 WL 554504, at *1–2, 2002 U.S. Dist. LEXIS 6624, at *4–5 (N.D.Ill. Apr. 15, 2002). This pointed reference to auto dealers as secondary to the true creditors—i.e., the financing companies to whom dealers forward customers' applications—underscores this court's finding that GMAC may be a creditor even as to those customers who obtain their cars through spot deliveries. Given this finding, there are no individualized issues presented by those who obtained their cars through spot deliveries that would defeat class certification.

### 3. The Operation of the "Multiple Creditor Rule"

The defendant argues that individualized issues will also plague the evaluation of GMAC's liability under what it terms ECOA's "Multiple Creditor Rule," thereby defeating commonality. (Docket No. 550 at 17.) The "Multiple Creditor Rule" is the exception outlined in Regulation B that protects some assignees from liability: "A person is not a creditor regarding any violation of the Act or this regulation committed by another creditor unless the person knew or had reasonable notice of the act, policy, or practice that constituted the violation before becoming involved in the credit transaction." 12 C.F.R. § 202.2(*l*). GMAC contends that, in order to hold it liable under the ECOA for the actions of the dealers, the plaintiffs would have to show, with respect to each individual contract purchased from a dealer, that GMAC had actual or reasonable notice of the practice by that dealer which constituted discrimination—"the purported violation" as defendant terms it. (Docket No. 550 at 18.)

Defendant's argument is unavailing. The plain language of the exception does not require that entities have knowledge of each individual discriminatory implementation of the policy. It merely requires that a creditor: "knew or had reasonable notice of the *act, policy, or practice that constituted the violation* before becoming involved in the credit transaction." 12 C.F.R. § 202.2(*l*) (emphasis added). A precise reading of the language suggests that, to be a creditor, a person need only have notice of the policy or practice, not each instance of discrimination. *See Smith,* 2003 WL 328719, at *4–5, 2003 U.S. Dist. LEXIS 1798, at *13–14 ("Only assignees without reasonable notice of the policy or practice which resulted in a violation of the ECOA under 12 C.F.R. § 202.2(*l*) are exempted, ... knowledge of the causative policy and practice of Defendant regarding the subjective 'mark-up' suffices to

give the requisite knowledge required under the Act and its regulation."); *Wise,* 2002 WL 31730920, at *3 ("[Defendant] argues that for an assignee to be liable under the ECOA, it must have notice of the discrimination. The Court must believe, however, that notice of the policy or practice that results in discrimination will be enough, especially where the allegation is of disparate impact.")

As noted by the *Wise* court, this plain reading is most logical, especially where the allegation is of disparate impact, a more subtle and insidious form of discrimination than disparate treatment. Plaintiffs' theory is that GMAC not only knew of, but designed and implemented, the practice that resulted in the discrimination—the GMAC finance charge markup policy. (Docket No. 437 ¶¶ 112, 126.) Having designed and implemented the finance charge markup policy, GMAC would have the requisite knowledge of the policy to be considered a creditor under the ECOA. Moreover, plaintiffs have alleged that the defendant had notice that commission-driven, subjective credit pricing systems similar to its own credit pricing system produce significant discriminatory effects, as a result of litigation by the Department of Justice concerning such systems and the subsequent publicity about the proceedings in relevant trade journals. *Id.* at ¶¶ 55–61.

Courts have held persons or entities to be protected by the ECOA exception in instances where the entities are truly arms-length assignees who had little or no knowledge of the business practices of the originating creditor that might have constituted ECOA violations. *See In re Armstrong,* 288 B.R. at 423–24 (assignee was not an ECOA creditor when it was an arms-length purchaser of a loan, and there was no evidence that it knew of the ECOA violation beforehand); *FGB Realty Advisors, Inc. v. Riedlinger,* 671 So.2d 560, 565 (La.Ct.App.1996) (subsequent possessor of a note is not an ECOA creditor when there was no allegation that it had knowledge of the act, policy, or practice that constituted the ECOA violation, and the entity did not come into existence until four years after the alleged violation).

Courts have also looked beyond defendants' invocation of the term "assignee" and the § 202.2(*l*) exception to scrutinize the actual practices of the defendant, and found them to be creditors despite these protections. *See Osborne v. Bank of America,* 234 F.Supp.2d at 808 (finding, despite defendant's argument that it merely obtained automobile loans through assignment and had no knowledge of discriminatory actions by dealers, that defendant could be deemed the originating creditor for ECOA purposes and that plaintiff had adequately alleged reasonable notice of discriminatory effects of dealers' subjective markup policy to render inapplicable the ECOA exception); *Jones,* 2002 WL 88431, at *3, 2002 U.S. Dist. LEXIS 1098, at *8–10 (finding defendant's participation in the credit decisionmaking process adequate to deem it a creditor, despite defendant's assertion that it did not have knowledge or reasonable notice of dealer discrimination). As plaintiffs have framed their claim, individual issues will not preclude analysis of whether or not GMAC may avail itself of the exception to the definition of creditor at 12 C.F.R. § 202.2(*l*).

Defendant's various arguments seeking to undermine plaintiffs' articulation of common questions of law and fact are not persuasive. Plaintiffs have carried their burden under the commonality prerequisite.

### C. Rule 23(a)(3): Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). Together with the requirement of Rule 23(a)(4), that the representative party adequately protect the interests of the class, this typicality requirement focuses on the characteristics of the class representatives. Newberg § 3:13. The Sixth Circuit has adopted the characterization of the typicality requirement of a leading treatise, as follows:

Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class so that the court may properly attribute a collective nature to the challenged conduct. In other words, when

such a relationship is shown, a plaintiff's injury arises from or is directly related to a wrong to a class, and that wrong includes the wrong to the plaintiff. Thus, a plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.

*American Medical Systems,* 75 F.3d at 1082 (citing 1 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 3–13, at 3–76 (3d ed.1992) (footnote omitted)). The Sixth Circuit in *Sprague* framed the typicality requirement succinctly: "as goes the claim of the named plaintiff, so go the claims of the class." *Sprague,* 133 F.3d at 399. The Court meant to suggest that typicality cannot be established when a named plaintiff who proves his own claim would not necessarily have proved anyone else's claim.

■ Plaintiffs assert that the named plaintiffs' claims are typical of the claims of the class because they are African–American and their claims arise from the same GMAC policy that gives rise to class member claims—the finance charge markup policy.[11] (Docket No. 537 ¶ 2.c.). Addie T. Coleman is an African–American who alleges that she obtained GMAC financing for her purchase of an automobile in April 1995 at a contract APR of 20.75% for six years. (Docket No. 437 ¶¶ 72, 80, 131.c.). Coleman alleges that this contract APR was actually a combination of GMAC's required risk-based buy rate of 18.25% and a subjective finance charge markup of 2.5%, which was added by the dealer pursuant to GMAC's markup policy and represents $809.76 in additional, non-risk-related finance charges. *Id.* at ¶ 82, 83.d. William M. Harrison is an African–American who alleges that he obtained GMAC financing for the purchase of an automobile in August 1997, and that as a result of GMAC's finance charge markup policy, he was charged total finance charges of $8,018.88, including a risk-

related finance charge of $6,491.47, plus a subjective, added finance charge of $1,527.41. *Id.* at ¶¶ 91, 95, 131.c. James L. Dixon is an African–American who alleges that he obtained GMAC financing for the purchase of an automobile in May 1998 and that, as a result of GMAC's finance charge markup policy, he paid total finance charges of *$37,480.58,* including a risk-related finance charge of $31,978.70, and a subjective, added finance charge of $5,501.88. *Id.* at ¶¶ 103, 107. The named plaintiffs allege that the subjective credit pricing policy employed by GMAC resulted in Coleman and other black GMAC credit applicants' paying disproportionately greater credit costs than white GMAC credit applicants for reasons unrelated to creditworthiness. *Id.* at ¶ 87.

Because the class representatives have alleged that their injuries arise from the same policy that gives rise to the claims of the rest of the class—the application, pursuant to GMAC's finance charge markup policy, of subjective, non-risk-based markup charges to GMAC's risk-based buy rate to yield their contract APR—their claims are typical of the class. Because the wrong they charge is the same wrong that they allege was levied against the class as a whole, their interests sufficiently align with the class members to achieve Rule 23(a)(3) typicality. Typicality is satisfied.

**D. Rule 23(a)(4): Adequacy of Representation**

■ Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R.Civ.P. 23(a)(4). The Sixth Circuit has recognized that this adequacy of representation requirement encompasses two criteria: "1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *Senter,* 532

---

11. Specifically, plaintiffs claim that class representatives are typical for five reasons, because they are: (1) blacks who obtained vehicle financing from GMAC during the class period; (2) were subject to GMAC's markup policy; (3) have a vested interest in their established credit relationship with GMAC; (4) will continue to need

auto financing services in the future; and (5) desire to be able to avail themselves of the benefits that GMAC makes available to existing and former GMAC credit customers without again being subjected to GMAC's discriminatory subjective credit pricing policy. (Docket No. 437 ¶ 130.c.)

F.2d at 525. The first criterion, that of common interest, essentially requires that there be no antagonism of interest or conflict of interest between the representative plaintiffs and the other members of the class they seek to represent. *See American Medical Systems*, 75 F.3d at 1083. The second criterion inquires into the competency of counsel. *Id.* The Sixth Circuit has observed that the adequacy of representation prerequisite overlaps with the typicality requirement because "in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *Id.* The Sixth Circuit has also noted that the adequacy of representation requirement is essential to due process because a final judgment in a class action is binding on all class members. *Id.*

To look at the second criterion first, the plaintiffs note that their counsel have aptly demonstrated adequacy throughout the long history of this litigation. (Docket No. 538 at 19 n. 10.) The plaintiffs and their counsel have conducted substantial discovery and produced significant proof of the claim, including acquiring and analyzing electronic deal file information, and have hired respected and experienced statistical experts to rebut GMAC's affirmative defenses. *Id.* Moreover, the defendant does not contest the competency of plaintiffs' counsel. Accordingly, the plaintiffs satisfy the second criterion of adequate representation.

As to the first criterion, plaintiffs assert that they have no antagonism of interest with the class members they represent because both they and the class members seek injunctive and declaratory relief as a result of defendant's allegedly unlawful practices. *Id.* Plaintiffs argue that, given the identity of legal claims between the representatives and the class members, there is no potential for conflicting interests in this action. *Id.*

### 1. *Res Judicata* and Due Process Issues

Challenging plaintiffs' argument as to the first criterion of adequate representation, the defendant argues that plaintiffs' pursuit of only injunctive and declaratory relief, and abandonment of claims for monetary damages, renders them inadequate class representatives and prejudices class members. (Docket No. 550 at 25.) GMAC asserts that plaintiffs' willingness to forego claims for monetary damages in order to seek certification after the Sixth Circuit's decision in *Coleman* rejecting the earlier class certification raises inherent conflicts with absent class members who may be barred by *res judicata* from pursuing their own claims for damages. *Id.* The defendant directs the court to a number of state and district court decisions that have found to be inadequate potential class representatives who split their claims in order to facilitate class certification, because their interests conflicted with class members who would pursue monetary remedies and whose individual suits might subsequently be precluded on *res judicata* grounds by class certification. *Id.* Additionally, the defendant asserts that this willingness to abandon damages claims denies absent class members and GMAC due process because of the potential preclusive effect of the judgment in this case. *Id.* at 27.

Rule 23(c)(3) provides, in relevant part, that: "The judgment in an action maintained as a class action under subdivision (b)(1) or (b)(2), whether or not favorable to the class shall include and describe those whom the court finds to be members of the class." Fed.R.Civ.P. 23(c)(3). The Advisory Committee's Note states: "Although thus declaring that the judgment in a class action includes the class, as defined, subdivision (c)(3) does not disturb the recognized principle that the court conducting the action cannot predetermine the *res judicata* effect of the judgment; this can be tested only in a subsequent action." Fed.R.Civ.P. 23(c)(3) Advisory Committee's Note. Thus, the present motion is not the proper vehicle for the determination of the *res judicata* effect of the judgment in this action. Nevertheless, the court will analyze the potential problem as the defendant has framed it.

The defendant's argument that class representatives are inadequate representatives presupposes that class members' individual actions for damages would be barred by the judgment in this class action, which seeks only declaratory and injunctive relief, whatever its outcome. As the following analysis

illustrates, defendant's initial proposition is not supported by legal authority. To this court's knowledge, the Sixth Circuit has never squarely addressed the question of whether class suits for declaratory and injunctive relief only preclude subsequent individual actions for monetary damages, but other relevant authority informs the court's analysis.

In *Cooper v. Federal Reserve Bank of Richmond,* the Supreme Court considered the question of whether a judgment in a class action determining that an employer did not engage in a general pattern or practice of racial discrimination against the certified class of employees precluded a class member from maintaining a subsequent civil action alleging an individual claim of racial discrimination against the employer. *Cooper v. Federal Reserve Bank of Richmond,* 467 U.S. 867, 869, 104 S.Ct. 2794, 81 L.Ed.2d 718 (1984). While recognizing the general doctrine of claim preclusion, the Court emphasized the difference between establishing that an employer had engaged in a pattern or practice of discrimination and establishing that an employer had discriminated against an individual employee. *Id.* at 874, 876, 104 S.Ct. 2794. The court held that individual plaintiffs in a subsequent action were bound under principles of *res judicata* by the prior adverse class action judgment, but that the preclusive effect merely barred the plaintiffs from bringing another *class action* against the employer alleging pattern or practice for the relevant time period or from relitigating whether the employer engaged in a pattern or practice of racial discrimination in any other litigation with the employer. *Id.* at 880, 104 S.Ct. 2794. The doctrine of *res judicata did not,* however, bar the plaintiffs from bringing their individual claims against the employer in separate actions. *Id.*

The Courts of Appeals have repeatedly recognized the general rule that "a class action suit seeking only declaratory and injunctive relief does not bar subsequent individual damages claims by class members, even if it is based on the same events." *Hiser v. Franklin,* 94 F.3d 1287, 1291 (9th Cir.1996), *cert. denied* 520 U.S. 1103, 117 S.Ct. 1106, 137 L.Ed.2d 308 (1997) (articulating the general rule and finding that a pris-

oner's individual claims for individual damages and injunctive relief were not barred by a previous class action in which his claim could not have been brought). *See also Fortner v. Thomas,* 983 F.2d 1024, 1031 (11th Cir.1993) ("It is clear that a prisoner's claim for monetary damages or other particularized relief is not barred if the class representative sought only declaratory and injunctive relief, even if the prisoner is a member of the pending class action."); *Norris v. Slothouber,* 718 F.2d 1116, 1117 (D.C.Cir.1983) ("A suit for damages is not precluded by reason of the plaintiff's membership in a class for which no monetary relief is sought."); Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction and Related Matters* § 4455 n. 19 (2003) (hereinafter "Wright & Miller") (collecting cases and noting, with regard to its summary of *Bogard v. Cook,* 586 F.2d 399, 408–409 (5th Cir.1978), *cert. denied* 444 U.S. 883, 100 S.Ct. 173, 62 L.Ed.2d 113 (1979), that "It may be possible to adopt a broader principle that at least ordinarily individual claims for damages are not part of the claim presented by an action for declaratory or injunctive relief under Civil Rule 23(b)(1) or (b)(2).") Lower federal courts have followed suit. *See, e.g., In re Methyl Tertiary Butyl Ether Products Liability Litigation,* 209 F.R.D. 323, 339 (S.D.N.Y.2002) (recognizing that courts considering civil rights violations routinely allow individual damages actions, even after class actions for injunctive relief, but finding that persons with personal injury or property claims in a mass tort case could not be adequately represented by a class action seeking only injunctive relief).

The court is also persuaded by the reasoning of a district court in the Sixth Circuit, the District Court for the Eastern District of Michigan, in *In re Jackson Lockdown/MCO Cases,* 568 F.Supp. 869 (E.D.Mich.1983). There, the court considered many issues in a consolidated action of claims brought by prison inmates alleging civil rights violations that occurred as a result of an unlawful lockdown and subsequent rioting at the State Prison of Southern Michigan. *Id.* at 872. Among the issues that the court considered was the state defendants' contention that the plaintiffs' complaint, which sought individual monetary

damages, was barred as *res judicata* by a prior Rule 23(b)(2) class action arising from similar prison conditions, where the only relief sought was declaratory and injunctive. *Id.* at 888, 891. The court was not convinced by the defendants' argument, relying instead on the fact that "every federal court of appeals that has considered the question has held that a class action seeking only declaratory and injunctive relief does not bar subsequent individual suits for damages based on the same or similar conditions." *Id.* at 892. Much of the reasoning for allowing subsequent individual damage suits instead of a class action addressing those claims focused on the manageability difficulties of a class action encompassing numerous individual claims for damages, and the court noted positively the careful certification of the prior class action so as not to encompass or preclude individual damage actions. *Id.* at 892–93. The court found that plaintiffs' individual actions for declaratory and monetary relief were not barred by the prior class action, which it ultimately characterized as substantially different from the current case. *Id.* at 893. These authorities underscore the idea that it is far from clear that money damages would be precluded in separate individual damages actions; thus, it is improper to consider the plaintiffs inadequate representatives based on any potential preclusive effect of this action.

The defendant cites a number of state and district court cases where putative class representatives were found inadequate because of the potential for their claims to bar subsequent individual claims, in support of its argument that subjecting absent class members to potential bars to individual monetary recovery renders them inadequate class representatives. (Docket No. 550 at 26–27.) For instance, GMAC cites *Thompson v. American Tobacco Co.*, 189 F.R.D. 544, 550 (D.Minn.1999), where potential class plaintiffs in tobacco litigation alleging industry-wide fraud were found to offer inadequate representation when they reserved the issue of personal injury and damages to make class certification more likely and sought only the relief of cessation and medical monitoring. The court was concerned that, by so limiting the class's claims, the class representatives

had potentially jeopardized class members' rights to bring subsequent personal injury and damages claims and characterized the potential prejudice as too great for the named plaintiffs' interests to be aligned with those of other class members. *Id.* at 551. The defendant cites an unpublished decision, *Clark v. Experian Informational Solutions, Inc.*, No. 8:00–1217–24, 2001 WL 1946329 at *1, *3–4, 2001 U.S. Dist. LEXIS 20024 at *3, *11, *13–14 (D.S.C. March 19, 2001), which similarly determined that plaintiffs could not satisfy the adequacy of representation requirement of Rule 23(a)(4) because they had disclaimed other, more substantial, claims that proposed class members might have had in favor of a single cause of action for statutory and punitive damages under the Fair Credit Reporting Act, thereby potentially prejudicing class members who might wish to pursue such claims and relief and illustrating that the representative plaintiffs' interests were misaligned with those of the class. The defendant also cites *Feinstein v. Firestone Tire & Rubber Co.*, 535 F.Supp. 595, 599, 601 n. 5, 606 (S.D.N.Y.1982) for its discussion of a potential Rule 23(b)(3) class action, seeking predominately money damages, *id.* at 601 n. 5, where class representatives asserted only claims arising from breach of implied warranty and sought only economic damages, when claims for death, injury, accident-related property damage, etc., could have also been pursued. The court found plaintiffs' design of the case to be essentially a cosmetic move that subjected putative class members to significant risks of being told later that they had impermissibly split a single cause of action, thereby raising due process and adequate representation problems. *Id.* at 606, 607 n. 16. These cases are all similarly distinguishable from the case at bar, in that they involved actions where the class representatives had left aside the far stronger claims for monetary damages and sought to have the weaker claims certified, for dubious strategic purposes. The courts were justifiably cautious in observing the potential preclusive effect of such weak class actions. Here, the potential individual monetary claims are relatively insubstantial, when compared to the death and injury claims in these other cases, and it can be fairly said that the

declaratory and injunctive relief sought in this case is a more significant form of relief than any requests for individual money damages.

The most relevant authority that the defendant cites is *Zachery,* where class certification was denied because of inadequate representation when, among several other deficiencies, class representatives decided to omit monetary claims (i.e., compensatory and punitive damages) from a case involving Title VII and § 1981 claims of racial discrimination to become a more attractive potential Rule 23(b)(2) class in light of a significant case restricting the availability of monetary damages in Rule 23(b)(2) classes—*Allison v. Citgo Petroleum Corp.,* 151 F.3d 402 (5th Cir.1998). *Zachery,* 185 F.R.D. at 243. The court recognized that it could not conclusively determine the *res judicata* effect of decisions yet to be handed down by the court but allowed itself to assess the risk of *res judicata* and consider that as part of its class certification decision. *Id.* The court concluded that the high risk of a preclusive effect of any class judgment on claims for intentional discrimination meant that class representatives could be gambling away proposed class members' potential rights to compensatory damages. *Id.* at 244. The *Zachery* case presents several of the same concerns as the case at hand—the proposed class is a Rule 23(b)(2) class, the claims involve racial discrimination, both involve representative plaintiffs responding to cases in the *Allison* line. However, standing alone in the adequacy of representation equation, the potential for a preclusive effect does not persuade the court in this instance. Circuit court precedent, discussed above, suggests that a judgment providing injunctive relief in this case would not foreclose individual damages actions. It is a recognized principle that the *res judicata* effect of a judgment must be determined in the subsequent litigation. The *Zachery* case has no binding effect on this court's judgment, and is not from the Sixth Circuit. Its persuasive effect does not sway the court into concluding that inherent conflicts plague the class representatives and render them inadequate representatives.

Similarly, the defendant's argument that certification of the proposed class would deny due process to absent class members and GMAC is not persuasive. The defendant argues that absent class members in subsequent individual damages suits would likely argue that preclusion of damages on *res judicata* grounds in a Rule 23(b)(2) class violates their due process rights because no notice or opt out is required.

The defendant points to two cases where subsequent plaintiffs advanced this argument. (Docket No. 550 at 27 n. 29.). The Fifth Circuit in *Johnson v. General Motors Corporation* considered whether the doctrine of *res judicata* barred an employment discrimination suit by an absent member of the plaintiff class as a result of a previous class action involving the same discrimination practices, where the class was certified under Rule 23(b)(2), sought no class-wide monetary relief, and did not provide notice to absent class members. *Johnson v. General Motors Corp.,* 598 F.2d 432, 433, 434 (5th Cir.1979). The court found that due process required notice to absent class members before individual monetary damages could be barred and that, though an absent class member could be bound by the *res judicata* effect of a Rule 23(b)(2) class action judgment as to injunctive or declaratory relief, he could not be barred from pursuing his individual monetary claim. *Id.* at 437–438. In reaching this conclusion, the Court relied on its previous decision in *Bogard,* where it held that a prisoner's claim for individual money damages was not barred by a prior class action (of which he was a knowing class member), alleging unconstitutional practices and seeking only injunctive and declaratory relief from those practices. *Johnson,* 598 F.2d at 437. The *Johnson* court also reasoned that, in a class action where only equitable relief is sought, the due process interests of absent class members of a cohesive plaintiff class, such as a class of black employees at an assembly plant, would be protected by adequate representation alone. *Id.*

The *Ninth Circuit* reached a similar conclusion in *Brown v. Ticor Title Insurance Co.,* 982 F.2d 386 (9th Cir.1992), *cert. dismissed,* 511 U.S. 117, 114 S.Ct. 1359, 128

L.Ed.2d 33 (1994). The court identified two exceptions to the general rule that a lawsuit involving the same parties and based upon the same cause of action as a previous suit is barred under the doctrine of *res judicata*—if the plaintiff was inadequately represented in the initial action or there was a denial of due process. *Id.* at 390. Recognizing that minimal due process requires that an absent plaintiff be provided an opportunity to opt out of a class action where monetary damages are at issue, the Court refused to hold an absent class member's subsequent damages claim barred by *res judicata* when he had not been given this right. *Id.* at 392. However, the Court concluded that the plaintiff would be bound by the injunctive relief provided by the class settlement and precluded from seeking other or further injunctive relief in his individual case. *Id.*

These cases align with the circuit court precedent cited above for the general proposition that individual monetary claims are not barred by previous class actions for declaratory and injunctive relief only. By contrast, the defendant argues that "the Court should recognize that certification would deny monetary relief to purported class members without affording them notice and opportunity to opt-out." (Docket No. 595 at 14.) As the cases suggest, the weight of appellate authority does not support this statement. Defendant's argument again depends on the proposition that class members' individual actions for damages would be barred by the judgment in this class action, whatever its outcome. The defendant argues that, if plaintiffs lose here, subsequent plaintiffs would be barred from relitigating liability issues and, therefore, no individual claims for damages by absent class members should be allowed. (Docket No. 550 at 27.) Defendant supports this statement with a citation to a single, unpublished, half-page Ninth Circuit decision, which held that a plaintiff's action for back pay (a form of equitable relief) was barred when plaintiff was a member of the class and could not claim inadequate representation. *See Greene v. Los Angeles Unified Sch. Dist.*, No. 97–55889, 2000 WL 1868198, 2000 U.S.App. LEXIS 33631 (9th Cir. Dec. 20, 2000). This decision does not outweigh the well-reasoned authority of the other circuits, including its own. In the face of the aforementioned authorities, this case is unpersuasive.

Nor is the court persuaded by defendant's citation to *Ortiz v. Fibreboard Corp.*, (Docket No. 595 at 13 n. 20), for the proposition that courts need to consider the due process rights of absent class members whenever their rights to non-"incidental" monetary relief will be impacted, since *Ortiz* concerned the certification of a Rule 23(b)(1)(3) mandatory class action followed by a settlement of its action for money damages, not injunctive relief. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 846, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999). Furthermore, if plaintiffs are unsuccessful on the merits of their claim, and absent class members are found to have received inadequate representation in this case, then subsequent absent class members will not be bound. *See Hansberry v. Lee*, 311 U.S. 32, 42–43, 45, 61 S.Ct. 115, 85 L.Ed. 22 (1940); *Gonzales v. Cassidy*, 474 F.2d 67, 74 (5th Cir.1973).

Defendant's due process argument is ultimately an indictment of the Rule 23(b)(2) mechanism, whereby absent class members are bound by a decision of which they likely had no notice nor opportunity to opt out, since notice is not required. There is nothing inherently more troubling about that aspect of this case than any other class proposed to be certified under Rule 23(b)(2). The collective nature of this claim makes it uniquely suitable for class certification. Because the authority suggests that future individual damages claims will not be barred, the defendant's adequate representation and due process concerns are not well-founded.

### 2. Claim-splitting and the Trial by Jury Clause

In a new legal argument advanced in the defendant's sur-reply, GMAC contends, in general support of its inadequacy of representation point, that the Trial by Jury Clause of the Seventh Amendment would be violated with respect to both GMAC and absent class members who might have claims for monetary damages as a result of what it terms the claim-splitting procedure advocated by the

plaintiffs, since issues common to the two claims would be determined initially by this court. (Docket No. 595 at 15.) The Trial by Jury Clause provides that "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury should be preserved." U.S. Const. amend. VII. The Supreme Court has explained that, after the adoption of the Federal Rules, attempts were made to indirectly undercut this jury right when federal courts considering cases involving both legal and equitable claims in one suit decided the equitable claims first and, in so doing, decided the issues common to both legal and equitable claims, thereby depriving the party seeking the jury trial as to its legal claim that right with regard to the common issues. *See Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 472, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962). The Court in *Beacon Theatres, Inc. v. Westover* thus required that any legal issues for which a trial by jury is timely and properly demanded be submitted to a jury, so as not to lose the jury trial of the legal issues through prior determination of equitable claims. *See Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 511, 79 S.Ct. 948, 3 L.Ed.2d 988 (1959); *Dairy Queen,* 369 U.S. at 473, 82 S.Ct. 894 (discussing *Beacon Theatres*). The Court in *Dairy Queen* required that, since common issues existed between the legal claims and the claim to equitable relief in that case, the legal claims with their attendant right to trial by jury had to be determined prior to any final court determination of the equitable claims. *Dairy Queen,* 369 U.S. at 479, 82 S.Ct. 894. The Sixth Circuit, in an unpublished decision, raised in a footnote that, in the event that the district court certified the plaintiffs' claim as a hybrid class action, such as by certifying a Rule 23(b)(2) class for equitable relief and a Rule 23(b)(3) class for damages, it had to be careful not to violate the Trial by Jury Clause and, thus, could not determine any issue in the claim for equitable relief that was common to the claim for money damages because it would foreclose the jury from determining that issue in the damages claim. *Reeb v. Ohio Dep't of Rehabilitation and Correction,* 81 Fed.Appx. 550, 554 n. 6 (6th Cir.2003). It is on this footnote that the defendant bases its argument. (Docket No. 595 at 15.)

Defendant's argument is unpersuasive and imprecise. The plaintiffs here do not seek a hybrid class action, nor do they seek equitable relief and damages in one suit, having abandoned all claims for monetary damages as part of the Seventh Amended Class Action Complaint. The cases interpreting the Trial by Jury Clause contemplate a situation in which both legal and equitable issues are presented in a single case, or where jury trial determination of the legal claims has been timely and properly demanded. *See Dairy Queen,* 369 U.S. at 473–74, 82 S.Ct. 894 (discussing *Beacon Theatres*). Here, the defendant attempts to show that the Seventh Amendment would be violated by determining issues now that might be common to hypothetical, follow-on suits for money damages that may or may not be brought, not live claims for which a jury has been timely and properly demanded. This is not mandated by the Trial by Jury Clause, and the court will not deny class certification on this ground.

Plaintiffs have shown that they are adequate representatives of the class as to the required two criteria.

### III. Rule 23(b)(2) Analysis

If a class is to be certified under Rule 23(b)(2), the plaintiffs must bear the burden of showing that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). The Advisory Committee's Note explains that the "subdivision is intended to reach situations where a party has taken action or refused to take action with respect to a class, and final relief of an injunctive nature or of a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, is appropriate." Fed. R.Civ.P. 23(b)(2) Advisory Committee's Note. The Sixth Circuit has observed that application of the Rule 23(b)(2) form is particularly appropriate when classwide discrimination is alleged, because "the common claim is sus-

ceptible to a single proof and subject to a single injunctive remedy." *Senter*, 532 F.2d at 525. *See also* Fed.R.Civ.P. 23(b)(2) Advisory Committee's Note (noting that subdivision (b)(2) properly reaches "various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration"); *Johnson v. Martin*, Nos. 2:00–CV–75, 1:01–CV–515, 2002 U.S. Dist. LEXIS 12550, at *28 (W.D.Mich. Apr. 29, 2002) (noting that suits involving allegedly illegal or unconstitutional prison policy are well situated for Rule 23(b)(2) certification because such classes seek to enjoin the operation of a policy, are dependent on the general legality or constitutionality of the policy, and are susceptible to common defenses as to the entire class).

■ The procedural protections of notice and opportunity to opt out of the class action are unnecessary in the Rule 23(b)(2) class action because "its requirements are designed to permit only classes with homogenous interests." *Coleman*, 296 F.3d at 447. *See also Holmes v. Cont'l Can Co.*, 706 F.2d 1144, 1155 (11th Cir.1983) ("Subsection (b)(2) by its terms, clearly envisions a class defined by the homogeneity and cohesion of its members' grievances, rights and interests." (internal quotation marks omitted)); *Duncan v. State of Tennessee*, 84 F.R.D. 21, 37 (M.D.Tenn.1979) ("A (b)(2) class must be cohesive and homogenous.").

The Sixth Circuit has observed that, in attempting to define a Rule 23(b)(2) class, it is proper for the category sometimes to be quite broad in scope and not as narrowly drawn as a class under Rule 23(b)(1) or 23(b)(3), because the relief sought is primarily injunctive or declaratory. *Weathers*, 499 F.2d at 1200. Courts in the Sixth Circuit and elsewhere also have noted that plaintiffs seeking class certification under Rule 23(b)(2) are not required to make out the predominance of common issues or the superiority of the class action to other forms of adjudication, as they would be if they sought certification under Rule 23(b)(3). *See Little Caesar Enterprises, Inc. v. Smith*, Nos. 93–40520, 93–40521, 1996 U.S. Dist. LEXIS 21012, at *110–*111 (E.D.Mich. Oct. 2, 1996);

*see also Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir.1998); Newberg § 4:11 ("Rule 23(b)(2) classes have no requirement that the common questions predominate over individual questions, or that the class action be superior to other available methods for the fair and efficient adjudication of the controversy.").

## A. Whether GMAC Has Acted on Grounds Generally Applicable to the Class

■ Plaintiffs argue that GMAC has acted on grounds generally applicable to the class. Specifically, plaintiffs allege that GMAC conducts its business in a standard manner throughout Tennessee and, for all relevant purposes, uses the same credit pricing policy throughout the United States. (Docket No. 437 ¶ 7.) Plaintiffs contend that a component of this standard credit pricing policy is the challenged finance charge markup policy, which authorizes the imposition by GMAC dealers of purely subjective finance charges on credit applicants in a manner unrelated to their creditworthiness, and which results in an unlawful discriminatory impact. (Docket No. 437 ¶¶ 12, 14, 114, 126.) As plaintiffs have argued the point, they assert that the specific finance charge markup policy is susceptible to common proof and common declaratory and injunctive remedies that will settle the legality of the behavior with regard to the class as a whole.

### 1. Whether the Class is Overbroad

The defendant argues that the proposed class definition is overbroad because it undoubtedly includes in the class individuals who lack standing to pursue their own claims. (Docket No. 550 at 22.) GMAC states that the court is unable to remedy this overbreadth by narrowing the class to include only those individuals who have been injured—for example, to include only those African–Americans whose markups exceed the average markup for white purchasers—because such a narrowing would contravene the clear holding of the Sixth Circuit that such inquiries are unsuitable for class treatment because they necessitate individual fact determinations. *Id.* at 23. The defendant

refs to the analysis of the court in *Osborne v. AmSouth Bank Corp.* for the proposition that the proper analysis of the alleged discriminatory markup examines contracts on a dealer-specific level within the specific time period surrounding the time of the plaintiffs' contracts. *Id.* at 22, 23. GMAC contends that the mere allegation that African–Americans are subject to a "discretionary markup" policy is not sufficient to establish standing, which requires an actual injury under ECOA. *Id.* at 23.[12] The defendant also argues that, pursuant to recent Sixth Circuit precedent, potential class members who have executed arbitration agreements as part of their retail installment sales contracts may not be members of the class.[13] *Id.* at 24. By failing to identify and exclude car purchasers subject to arbitration agreements from the class definition, the defendant asserts that plaintiffs have created an overbroad class. *Id.* To determine which contracts are subject to arbitration, GMAC contends that each contract will have to be examined, either at the individual or dealer level. *Id.* at 25.

Regarding standing, the Supreme Court has made clear that the elements of standing are "not mere pleading requirements but rather an indispensable part of the plaintiff's case," which "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (stressing that general factual allegations of injury resulting from defendant's conduct may suffice on motion to dismiss, but plaintiff must set forth at summary judgment stage

specific factual evidence that will be taken to be true and must support those facts, if controverted, by evidence adduced at trial in the final stage). *See also Airline Prof'ls Assoc. v. Airborne, Inc.*, 332 F.3d 983, 987 (6th Cir.2003) (quoting *Lujan*).

The plaintiffs respond to defendant's challenge by asserting that this court has already ruled on the sufficiency of plaintiffs' pleadings to establish standing in its order granting in part and denying in part defendant's Motion to Dismiss it from the Seventh Amended Class Action Complaint. (Docket No. 497 at 6–9.) Plaintiffs are correct in their argument that the court has already established that the class representatives have properly alleged standing for the purposes of surviving the Motion to Dismiss. While the manner and degree of evidence required to satisfy plaintiffs' burden of proof at class certification is higher than the burden at the motion to dismiss stage, defendants have not substantively challenged the standing of the *class representatives* in the instant motion, relegating their passing argument on this point to a footnote.[14] Because the defendant has fully briefed its challenge to class representatives' standing as part of its ending Motion for Summary Judgment, and because the plaintiffs have not yet had an opportunity to respond to defendant's argument on this score, the court will reserve its analysis of class representatives' standing for the summary judgment motion, as it has previously suggested it would: "Should discovery fail to substantiate the plaintiffs' allegations and the inferences the court now draws in their favor, GMAC may again challenge plaintiffs' ability to establish standing

12. In arguing that the proposed class is overbroad, the defendant again raises the objection that liability cannot attach to GMAC as an ECOA creditor with respect to individuals who engaged in spot delivery transactions and that to determine which class members engaged in these transactions in order to exclude them from the class would overwhelm the action. The court has already discussed this argument at length in considering whether the plaintiffs satisfy the commonality requirement of Rule 23(a), and has found it unavailing.

13. The defendant states that arbitration clauses exist in contracts acquired by GMAC in Missis-

sippi and Alabama and that, in some other states, dealerships may use their own arbitration agreements or use generic forms that contain arbitration agreements. (Docket No. 550 at 24.)

14. The defendant states: "GMAC recognizes that the Court has concluded that the Plaintiffs have alleged facts upon which their own standing for an injunction can rest, but GMAC continues to disagree with the Court's conclusion. Where a plaintiff's proof of future injury is 'hypothetical and conjectural,' he/she does not have standing." (Docket No. 550 at 22 n. 26.)

on a motion for summary judgment." *Id.* at 8–9.

The defendant raises a more specific question, however, regarding the status of class members, when it argues that the proposed class definition is overbroad because it undoubtedly includes in the class individuals who lack standing to pursue their own claims. While the defendant frames this alleged deficiency as a standing problem, the court reads the argument more as a challenge to the plaintiffs' ability to carry their burden under Rule 23(b)(2), which requires that the plaintiffs show that "the party opposing the class has acted or refused to act on grounds generally applicable to the class." Fed.R.Civ.P. 23(b)(2). In a class action, the standing question is resolved with regard to the representative plaintiffs.[15] Especially in a putative Rule 23(b)(2) class action, where the potential class members cannot be enumerated, attempting to conduct a standing analysis with respect to these unenumerated class members would be impossible. The court reads GMAC's argument in this way because the crux of its argument is that the class is overbroad because some class members have sustained no injury: "Even when damages are not sought, a valid class must still have commonality of injury, because injury is an element of liability." (Docket No. 550 at 22.) The defendant cites a number of cases for the proposition that overbroad class definitions are improper when the class members might not have been injured by the challenged practice.

The defendant's position is contradicted by the Advisory Committee's Note to Rule 23(b)(2), by numerous authorities, and by prominent commentators. The Advisory Committee's Note to Rule 23(b)(2) states: "Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class." Fed.R.Civ.P. 23(b)(2) Advisory Committee's Note. Many courts have relied on the interpretation of a leading treatise with regard to this section, which states: "All the class members need not be aggrieved by or desire to challenge defendant's conduct in order for some of them to seek relief under Rule 23(b)(2). What is necessary is that the challenged conduct or lack of conduct be premised on a ground that is applicable to the entire class." Wright & Miller § 1775 (footnote omitted). *See Griffin v. Burns,* 570 F.2d 1065, 1073 (1st Cir.1978) (citing Wright & Miller and finding that not all class members need be aggrieved by defendant's conduct in order for some to seek relief under Rule 23(b)(2) in an action arising from a dispute over the use of certain ballots in a special Democratic primary); *Davis v. Weir,* 497 F.2d 139, 146 (5th Cir. 1974) (citing Wright & Miller and noting that not all class members need be aggrieved by defendant's conduct in a Rule 23(b)(2) class action challenging certain practices of the city water utility, but limiting broad class that had been certified by district court); *Edmondson v. Simon,* 86 F.R.D. 375, 383 (N.D.Ill.1980) (applying Wright & Miller's language and finding Rule 23(b)(2) certification appropriate in Title VII disparate impact case regarding employment policies of the Chicago office of the Internal Revenue Service). The Ninth Circuit has said:

> [W]ith respect to 23(b)(2) in particular, the government's dogged focus on the factual differences among the class members appears to demonstrate a fundamental misunderstanding of the rule. Although common issues must predominate for class certification under Rule 23(b)(3), no such requirement exists under 23(b)(2). It is sufficient if class members complain of a pattern or practice that is generally appli-

---

**15.** Newberg is instructive on this point: "In a class action, those represented are, in the words of the Supreme Court, passive members of the class, in contrast to the named plaintiff who is actively prosecuting the litigation in their behalf. These passive members need not make any individual showing of standing, because the standing issue focuses on whether the plaintiff is properly before the court, not whether represented parties or absent class members are properly before the court. Whether or not the named plaintiff who meets individual standing requirements may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends rather on meeting the prerequisites of Rule 23 governing class actions." Newberg § 2.7 (internal footnotes omitted).

cable to the class as a whole. Even if some class members have not been injured by the challenged practice, a class may nevertheless be appropriate.

*Walters,* 145 F.3d at 1047 (finding Rule 23(b)(2) certification to be proper despite government's argument that individual proceedings resulting from an injunction would undermine judicial efficiency in an action by aliens claiming that their due process had been violated as a result of certain procedures of the Immigration and Naturalization Service).

Many other courts in the Sixth Circuit and elsewhere have relied on the Advisory Committee's Note's explanation to find that certification of a Rule 23(b)(2) class is proper, despite the fact that not all class members may have suffered the injury posed by the class representatives, as long as the challenged policy or practice was generally applicable to the class as a whole. *See McGee v. East Ohio Gas Company,* 200 F.R.D. 382, 391 (S.D.Ohio 2001) ("That [the class representative] may be the only member of the class actually to have suffered an allegedly illegal consolidation is of no moment here, provided it [was] based on grounds which have general application to the class." (quoting the Rule 23(b)(2) Advisory Committee's Note)); *Vermeulen v. Kheder,* 599 F.Supp. 1217, 1227 (W.D.Mich.1984) ("As noted in the Advisory Committee Notes to the 1966 Amendments to Rule 23, the (b)(2) subsection is appropriate in a lawsuit 'even if [the injury] has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class.'" (alteration in the original)); *see also Arnold v. United Artists Theatre Circuit, Inc.,* 158 F.R.D. 439, 455 (N.D.Cal.1994) ("Advisory Committee Note expressly provides that where action would generally affect members of the class in the same way, but has only actually affected a subset of the class, (b)(2) certification is still appropriate."); *Ortiz v. Eichler,* 616 F.Supp. 1046, 1058 (D.Del.1985) ("It is irrelevant that not all class members have been affected by all of the challenged practices."); *Metropolitan Area Housing Alliance v. U.S. Dep't of Housing,* 69 F.R.D. 633, 638 (N.D.Ill.1976) ("[M]any class actions under (b)(2) have been brought by representatives of a class which includes members who have not been the object of the challenged behavior."); *Massie v. Illinois Dep't of Transportation,* No. 96 C 4830, 1998 WL 312021, at *5 (N.D.Ill. June 5, 1998) (certifying a Rule 23(b)(2) class in an action alleging both intentional discrimination and disparate impact in promotion policies, despite the fact that some class members may not have been explicitly or directly denied a promotion).

In *Osborne v. AmSouth Bank Corp.,* a case on which the defendant relies, summary judgment was granted when the representative plaintiffs were unable to show that they had suffered injury and, thus, were unable to prove standing. *Osborne v. AmSouth Bank Corp.,* No. 3:02–CV–577, 2003 WL 22025067, at * 2 (M.D.Tenn. July 15, 2003). But *Osborne v. AmSouth Bank Corp.* is distinguishable from the issue at hand. Here, defendant's main argument is that there may be *class members,* not class representatives, who have not suffered injury. Relying on the aforementioned authority, which establishes that not all class members must be aggrieved by the defendant's conduct as long as the challenged policy is generally applicable to the class as a whole, the court finds that defendant's objection is not fatal to Rule 23(b)(2) class certification. The additional authorities that GMAC cites in support of its position do not convince the court otherwise.[16]

**16.** In *Canady v. Allstate Insurance Co.,* an unpublished decision of the District Court for the Western District of Missouri, the court found that plaintiffs defined an improperly broad class when they sought to assert civil rights and Fair Housing Act claims to challenge defendant's alleged practice of insurance redlining and sought to establish the affected neighborhoods by reference to zip code boundaries. *Canady v. Allstate Insurance Co.,* No. 96–0174–CV–W–2, 1997 WL 33384270, at *7 (W.D.Mo. June 19, 1997). The court found that this manner of designating minority neighborhoods by zip code would invariably also include expensive neighborhoods and historic homes not minority owned. *Id.* Therefore, the court found that "plaintiffs have not borne their burden of proving that every person living within a predominantly minority zip code has suffered injury in fact." *Id.* at ¹8. This interpretation of a plaintiff's burden is not logical within the context of a class action, is not borne

How narrowly or broadly a class may be defined depends largely on the relief sought. Newberg § 6:15. A class seeking declaratory and injunctive relief can be much more broadly defined than classes seeking damages. *See id.; see also Weathers,* 499 F.2d at 1200 ("In attempting to define a (b)(2) class, it should be noted that the category may in some instances be quite broad in scope. The nature of the primary relief sought in this category, injunctive or declaratory relief, does not require that the class be as narrowly confined as under either (b)(1) or (b)(3)."). The *Weathers* court explained that, when monetary damages are sought instead of mere declaratory and injunctive relief, the reasons the district court may wish to define the class more narrowly are "first, to protect the defendant in preparing his defenses against various damage claims, and second, to make the disposition of the class action more manageable since the evidence as to individual claims may vary widely in scope and character." *Id.*

In the instant case, the relief sought is exclusively declaratory and injunctive—the plaintiffs seek a declaration that GMAC's credit pricing policy violates the ECOA and all appropriate equitable relief necessary to enforce the ECOA. (Docket No. 437 ¶ 132, Prayer for Relief ¶¶ 2, 3.) The definition of the earlier, certified class seemed driven by the plaintiffs' seeking compensatory damages; plaintiffs more narrowly defined the class in the first instance to include only those African–American class members "who were charged a finance charge markup greater than the average finance charge markup charged white consumers," presum-

ably so that the affected class members could be ascertained and their damage claims calculated precisely. Plaintiffs no longer seek any form of monetary damages and only seek forward-looking, injunctive change to the claimed generally-applicable finance charge markup policy which allegedly results in a discriminatory effect on members of the putative plaintiff class. This change permits the court to define the class more broadly, as is proper with respect to a class seeking only declaratory and injunctive relief. Also, as discussed above, pursuant to the Rule 23(b)(2) Advisory Committee's Note and relevant authority, a Rule 23(b)(2) class may include those subject to the generally applicable policy but who do not suffer the injury.

For these reasons, it is proper to define the plaintiff class without reference to the specific injury that the representative plaintiffs claim and merely to define the class as all those subject to the generally applicable policy which they challenge, i.e.: "All black consumers who obtained non-recourse vehicle financing from GMAC in the United States pursuant to GMAC's 'Retail Plan—Without Recourse' between May 10, 1989 and the date of judgment." (Docket No. 537 at 1.) This definition is supported by the *Cason* court's certification of a similarly broad Rule 23(b)(2) class for declaratory and injunctive relief on similar facts. *See Cason,* 212 F.R.D. at 523.

Regarding the defendant's argument that the class definition is overbroad because it fails to identify and exclude car purchasers that might be subject to arbitration agreements, Sixth Circuit precedent provides that

out by the authority the *Canady* court cites in support of it, and is improper given the mandates of the Rule 23(b)(2) Advisory Committee's Note and the aforementioned authorities that endorse it. In *MidPeninsula Citizen for Fair Housing v. ACCO Mgmt. Co.,* the court summarily refused to certify a class because injunctive relief was moot when the challenged policy had been changed, and common questions did not predominate as to damage issues—a Rule 23(b)(3) inquiry. *MidPeninsula Citizen for Fair Housing v. ACCO Mgmt. Co.,* 168 F.R.D. 647, 649 (N.D.Cal.1996). Although the *MidPeninsula* court does state that the plaintiffs' class definition is overbroad, the fact that the class could include families who were not "injured" (a word supplied by GMAC, not the *Midpeninsula* court) was only one of a

number of reasons that led the court to find the class improperly defined. *Id.* at 648–49. The court did not conduct a standing inquiry or consider the significance of the lack of "injury" within the context of a Rule 23(b)(2) inquiry—it was a minor point. In *Williams v. Ford Motor Co.,* the representative plaintiff was found to lack Rule 23(a)(3) typicality in a putative Rule 23(b)(3) class when his injury was different from the injury that nearly every other class member would have asserted. *Williams v. Ford Motor Co.,* 192 F.R.D. 580, 586 (N.D.Ill.2000). This holding does not contradict the finding of this court with regard to whether all class members must be aggrieved by the defendant's conduct as long as the challenged policy is generally applicable to the class as a whole.

class certification should not be denied merely because some class members may be subject to the defense that their claims are barred by valid documents releasing the defendant from liability. *See Bittinger v. Tecumseh Products Co.*, 123 F.3d 877, 884 (6th Cir.1997) (finding class certification to be proper despite the fact that some class members signed papers releasing the defendant from liability). Other courts have held similarly. *See Bond v. Fleet Bank (RI), N.A.*, No. Civ.A. 01–177 L., 2002 WL 31500393, at *6–*7 (D.R.I. Oct. 10, 2002) (report and recommendation discarding defendant's argument that plaintiff's proposed class was overbroad because some class members might be subject to arbitration and recommending that this fact not defeat the merits of class certification); *Collins v. International Dairy Queen, Inc.*, 168 F.R.D. 668, (M.D.Ga.1996) (granting class certification and defining a subclass of class members whose claims might be subject to arbitration); *Finnan v. Rothschild & Co.*, 726 F.Supp. 460, 465 (S.D.N.Y.1989) (finding that the fact that some class members had signed releases or arbitration agreements was subordinate to the larger common defense of the defendant and did not defeat the merits of class certification). These courts have proceeded by ruling on the merits of the class certification and reserving the right to create subclasses or exclude members from the class at a later juncture. *See Bittinger*, 123 F.3d at 884; *Bond*, 2002 WL 31500393, at *7; *Collins*, 168 F.R.D. at 678 (creating a subclass); *Finnan*, 726 F.Supp. at 465.

The court is not persuaded by GMAC's arguments that seek to undermine the viability of the class because of the potential for some class members to have signed arbitration agreements. The fact that this court has previously ruled that a *potential class representative* subject to arbitration was not a proper class representative for this action does not foreclose class certification due to the possibility that some unnamed class members might have signed arbitration agreements. Nor does the defendant's citation to *Wright*, since the *Wright* court did not substantively consider the issue but merely stated that employees subject to arbitration agreements would not be able to participate in the lawsuit as class members in the context of considering whether the plaintiffs satisfied the requirement of numerosity if some were to be excluded. *Wright*, 201 F.R.D. at 538. The possibility that some class members might have signed arbitration agreements does not defeat class certification, although the court reserves the right to create a subclass, modify the class definition, or otherwise specially treat the class members subject to arbitration at a later juncture.

### 2. Whether Evaluation of Plaintiffs' Agency Theory of Liability Precludes Cohesiveness of the Class

As a secondary theory of liability, plaintiffs assert that GMAC is liable for the actions of the dealers under agency principles of express authority and apparent authority. (Docket No. 437 ¶ 115.) Defendant challenges this theory and its effect on class certification, arguing that evaluation of the agency theory requires individualized inquiries and precludes a finding of class cohesiveness, which is generally understood as a characteristic of Rule 23(b)(2) classes. (Docket No. 550 at 18.) GMAC asserts that it is undisputed that no formal or contractual agency relationships exist and argues that any evaluation of an agency relationship will necessitate factual determinations for each dealer to show that GMAC executed the requisite level of control over each dealer's actions—an inquiry unsuitable for class treatment. *Id.* at 18–19. GMAC further contends that agency determinations would vary from dealer to dealer and from state to state, creating manageability problems. *Id.* at 19. Even if GMAC's alleged authorization of dealers' actions is enough to establish a principal-agent relationship, the defendant argues that individual fact determinations would be necessary to evaluate this authorization. *Id.* at 20.

Whether or not an agency relationship exists between two parties is a question of fact. *See Osborne v. Bank of America*, 234 F.Supp.2d at 809, 809 n. 2; *see also Balderos v. City Chevrolet*, 214 F.3d 849, 853 (7th Cir.2000); *Strohmaier v. Yemm Chevrolet*, 211 F.Supp.2d 1036, 1043 (N.D.Ill.2001). As the defendant asserts, courts that have faced

similar allegations of agency, in contexts such as mortgage lending and automobile financing, have held that a class cannot be certified with regard to liability under an agency theory because such an action would require a multitude of individualized, factual inquiries to determine whether an agency relationship existed in each particular case. *See Williams v. Ford Motor Co.*, 192 F.R.D. 580, 585 (N.D.Ill.2000) (denying class certification based in part on the individual issues central to plaintiff's agency theory); *Mack v. General Motors Acceptance Corp.*, 169 F.R.D. 671, 678 (M.D.Ala.1996) (denying class certification as to plaintiff's breach of fiduciary duty claim because of the predominance of individual inquiries into agency relationships between the dealers and the buyers); *O'Brien v. J.I. Kislak Mortgage Corp.*, 934 F.Supp. 1348, 1357 (S.D.Fla.1996) (denying class certification when plaintiffs' agency theory would require individualized determination of whether an agency relationship existed for each mortgage loan transaction); *Barboza v. Ford Consumer Finance Co.*, No. 94–12352–GAO, 1998 WL 148832, at *4, 1998 U.S. Dist. LEXIS 14170, at *13–14 (D.Mass. Jan. 30, 1998) (denying class certification with regard to Ford's liability for interfering with the dealer and buyer's potential fiduciary or agency relationship because the existence of such a relationship is "not a matter susceptible to proof on a classwide basis" since "the nature of the relationship is not universally established but rather is set by the actual dealings between the individual borrower and the individual broker"); *Mulligan v. Choice Mortgage Corp. USA*, No. 96–596–B, 1998 WL 544431, at *8–9, 1998 U.S. Dist. LEXIS 13248, at *25–28 (D.N.H. Aug. 11, 1998) (denying class certification when class members would have to prove through the facts and circumstances of each transaction that an agency relationship existed between a mortgage company and each particular class member); *Hickey v. Great Western Mortgage Corp.*, No. 94 C 3638, 1995 WL 121534, at *7–8, 1995 U.S. Dist. LEXIS 3357, at *19–23 (N.D.Ill. Mar. 17, 1995) (denying class certification because of the predominance of individualized issues with regard to whether the closing person on a mortgage was an agent of the lender).

However, all of the authorities that the court has noted above to indicate that class certification is routinely denied because of the multitude of individualized inquiries necessary to establish the agency relationship have made this determination in the context of the Rule 23(b)(3) predominance inquiry, finding that, because individualized inquiries as to agency must be made, common issues do not predominate over individual questions with respect to that theory. The predominance inquiry requires the court to determine whether "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3). Class actions maintained under Rule 23(b)(2), as in the instant case, do not require the same predominance or superiority considerations as Rule 23(b)(3) class actions. *See Little Caesar Enterprises*, 1996 U.S. Dist. LEXIS 21012, at *110–*111; *see also Walters*, 145 F.3d at 1047; Newberg § 4:11. In conducting an analysis under Rule 23(b)(2), courts are merely required to find that the defendant has acted or refused to act on grounds generally applicable to the class.

Because the court conducting the class certification analysis need not consider whether common issues predominate over individual issues, the plaintiffs are entitled to attempt to show that GMAC has a principal-agent relationship with dealers. Plaintiffs allege that GMAC controlled, implemented and profited from the GMAC finance charge markup policy, (Docket No. 437 ¶ 112), and may attempt to prove that, for instance, GMAC has a standardized relationship with dealers such that it could be considered a principal-agent relationship under applicable state law.

The court observes, however, that the hurdles plaintiffs face in pursuing their agency theory are quite high. As the cases cited above suggest, the agency question is most often required to be proven as to each alleged principal-agent relationship; therefore, it is unlikely that plaintiffs will be able to adduce evidence to make out a standardized

agency relationship for GMAC as to all dealers. Also, courts are nearly universal in finding that auto dealers are not agents of auto financing companies, even given evidence almost identical to the evidence proposed by the plaintiffs in this case. *See, e.g., Pescia v. Auburn Ford–Lincoln Mercury, Inc.,* 68 F.Supp.2d 1269, 1282–83 (M.D.Ala. 1999) (finding no evidence that an auto financing company asserts control over a dealer so as to be a principal to the dealer's agent despite the fact that the financing company dictated the terms of an acceptable assignment and instructed the dealer to achieve a "hard close"); *Mardis v. Ford Motor Credit Co.,* 642 So.2d 701, 704–704 (Ala. 1994) (finding no agency relationship when financing company exercised no influence over dealer's negotiations with its customers and had no authority over how dealer conducted its business of selling cars, despite the fact that the financing company supplied contract forms to the dealer and could approve or disapprove a credit application filled out by the dealer); *Chrysler Credit Corp. v. Barnes,* 126 Ga.App. 444, 191 S.E.2d 121, 127–28 (1972) (finding insufficient evidence of an agency relationship even when contract forms were provided by financing company, financing company did not accept assignment unless it generally approves buyer's credit and contract is properly filled out, and financing company and dealer had a general agreement as to the financing of cars); *Dunn v. Midland Loan Finance Corp.,* 206 Minn. 550, 289 N.W. 411, 415 (1939) (finding no proof that dealer was auto financing company's agent despite a course of dealing whereby finance company made successive purchases of paper from auto dealer).

In addition, the agency theory seems needlessly redundant at best. The plaintiffs attempt to show that GMAC is in a principal-agent relationship with its dealers and, therefore, is vicariously liable for the actions of the dealers. However, as this is a single cause action, plaintiffs ultimately seek to hold GMAC vicariously liable only for dealers' violations of the ECOA. Plaintiffs make a much stronger case for GMAC's liability under ECOA's definition of creditor or assignee than under the agency theory. The agency theory is tenuous and redundant, and courts in similar situations have declined to consider it important. *See, e.g., Wise,* 2002 WL 31730920, at *3 ("It is not necessary for the Court to address [defendant's] argument that no agency relationship exists between it and the retail sellers. Plaintiffs' theory of liability does not hinge on the existence of an agency relationship.")

Defendant's arguments that seek to undermine plaintiffs' showing that GMAC has acted on grounds generally applicable to the class are unavailing. The plaintiffs have satisfied this requirement.

**B. Whether Final Injunctive or Corresponding Declaratory Relief is Appropriate to the Class as a Whole**

The second requirement of Rule 23(b)(2) is that the defendant's generally applicable actions make "appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). In this case, plaintiffs challenge the legality of a specific policy—the finance charge markup policy—applied against the class as a whole and seek only declaratory and injunctive relief to redress the alleged wrong. (Docket No. 437 ¶¶ 126, 132.) Specifically, plaintiffs "seek to obtain declaratory and injunctive relief requiring GMAC to implement company policies designed to prevent the illegal discrimination [alleged] and for whatever further equitable relief the Court deems appropriate to remedy the illegal discrimination that already has taken place." *Id.* at ¶ 132.

It was on the question of relief that the Sixth Circuit reversed this court's earlier certification of a class in this case: "[W]e hold that the district court abused its discretion in certifying the proposed class under Rule 23(b)(2) because compensatory damages under the ECOA are not recoverable by a Rule 23(b)(2) class." *Coleman,* 296 F.3d at 450. The Sixth Circuit found that injunctive relief would not predominate, as is required of a Rule 23(b)(2) class, when the plaintiffs included a prayer for compensatory damages, measured by reference to the markup charged each member of the class, along with their prayer for injunctive relief. *See id.* at

448–49. The Court found that seeking compensatory damages undermined the assumption of homogeneity that characterizes a Rule 23(b)(2) class because each member would have an individual stake in the outcome; that individualized determinations necessary to calculate the damages for each class member eliminated the efficiencies of classwide adjudication; and that the primary justification for class treatment of these claims would be absent because the ECOA provides for attorney's fees and costs. *Id.* at 449.

By seeking declaratory and injunctive relief only, the plaintiffs have rectified the problems with their prior class claim and fulfilled the second requirement for a Rule 23(b)(2) class, that the appropriate relief be final injunctive relief or corresponding declaratory relief with respect to the class as a whole. Plaintiffs have preserved homogeneity of interest, eliminated the individualized damage inquiries that troubled the Sixth Circuit, and presented a proper Rule 23(b)(2) class claim.

## IV. Special Rate or Special APR Programs

■ Some GMAC financing occurs under Special Rate, or Special APR, Programs. Plaintiffs define these programs as Special APR Programs under which GMAC offers reduced or zero markup programs that it authorizes dealers to offer to GMAC credit applicants who meet certain specified criteria. (Docket No. 437 ¶ 16.) Plaintiffs observe that, in most cases, though not all, GMAC prohibits markup of Special APR contracts. (Docket No. 538 at 11.) Defendant defines these programs as Special Rate Programs which may be designed either by General Motors Corporation or GMAC to serve a range of purposes and which offer one of two alternatives: a cash rebate or below-market rate financing with respect to particular deals. (Docket No. 550 at 3, 4; Docket No. 555, Declaration of David Jones ¶¶ 7, 8, 12.) Special rate contracts are one of the two alternatives offered, under which the buyer elects a below-market APR. *Id.* at 3–4. The defendant asserts that these special rate contracts either prohibit spread (i.e., markup) or permit only a limited spread. *Id.* at 4.

Plaintiffs assert that the class should include those who financed under Special APR programs because they argue that all customers are subject to GMAC's finance charge markup policy, even when a special rate program is available. (Docket No. 538 at 11; Docket No. 595 at 3.) The defendant asserts that, because special rate contracts are distinct from standard rate contracts, and plaintiffs seek to have consumers who finance under both certified as a class, plaintiffs run afoul of the requirements that the class claims share common questions of fact and law, that the claims of named plaintiffs be typical, and that the party opposing a 23(b)(2) class must have acted on grounds generally applicable to the class. (Docket No. 574 at 3; Docket No. 550 at 6–7.) The defendant asserts that special rate contracts are fundamentally different from other contracts that it purchases because special rate contracts are generally not subject to markups and are susceptible to different business justifications than standard rate contracts. *Id.* at 7. The defendant asserts that plaintiffs argue that Special Rate Programs are discriminatory under a different theory— that they are made available on a racially disparate basis—but that plaintiffs have made no effort to account for customers who chose to receive cash rebates under Special Rate Programs and thus became part of the traditional financing, as opposed to those who took advantage of the below-market APRs offered under special rate contracts. *Id.*

GMAC argues that plaintiffs seek to combine the two practices merely because they both allegedly cause disparate impact. *Id.* The defendant argues that this combination is improper when plaintiffs cannot identify the specific aspect of Standard Rate Programs that causes disparate impact; therefore plaintiffs run afoul of the requirement that they specifically identify the practice they challenge in order to show how the practice causes a racial disparity. *Id.* at 8. Finally, GMAC argues that Special Rate Programs differ widely from one another, and thus individual proofs as to each program would be required to make out causation and business justification. *Id.* at 9.

The plaintiffs allege that the inclusion of persons who finance under Special APR programs in this case does not defeat class certification because all GMAC applicants are subject to markup. (Docket No. 574 at 5.) Specifically, plaintiffs assert that GMAC's Special APR programs contribute to the credit pricing racial disparity in two ways: (1) by allowing for dealer subjectivity, which arises when dealers have the discretion to arrange an eligible customer's financing transaction either under an appropriate Special APR program that prohibits markup or under the standard rate program that is susceptible to markup (and potentially arrange a cash rebate for the customer), and (2) by setting parameters that disproportionately exclude African–Americans from eligibility for the low or no markup programs. (Docket No. 538 at 11; Docket No. 574 at 5.) As to the second theory—that GMAC designs its Special APR programs in a manner that disproportionately excludes African–Americans from eligibility—such an allegation is distinct from the finance charge markup policy that plaintiffs purport to challenge in their complaint: "The specific and identifiable facially neutral GMAC credit pricing policy that the plaintiffs are challenging is GMAC's finance charge markup policy." (Docket No. 437 ¶ 126.) Although plaintiffs may argue that GMAC's business of setting the parameters of the Special APR programs are part of the defendant's credit pricing policy on a general level, it is not part of the facially neutral finance charge markup policy that is the crux of plaintiffs' core allegation: "African–Americans pay substantially more in subjective, non-risk-related finance charge markup for automobile loans than whites. This is the very definition of disparate impact and it is caused by GMAC's policy of authorizing its dealer/arrangers to add subjective, non-risk-based markup charges onto GMAC's risk-based buy." (Docket No. 538 at 16.)

The proof that plaintiffs would have to adduce in order to prove disparate impact as a result of the eligibility requirements of the Special APR programs is not the same as the evidence that they would offer to prove that the application of finance charge markups falls more heavily on African–Americans than whites, which is the core purpose of their class action. Also, the injunctive relief that would accompany such a finding is significantly different from the injunctive relief that would remedy the violation presented by plaintiffs' core allegation. A claim that the design of the Special APR programs has discriminatory impact is not equivalent to a claim that the non-risk-related finance charge markup for automobile loans is higher for African–Americans than for whites—it is a distinct claim that does not belong in this case.

Plaintiffs' other theory, the "steering" theory, is no more persuasive. Plaintiffs contend that all customers are subject to GMAC's finance charge markup policy, even when a special rate is available. (Docket No. 574 at 3.) In essence, plaintiffs claim that eligible customers may be exposed to dealer subjectivity at two points: first, if the customer is eligible for a Special APR program, when the dealer has the discretion to finance her transaction in accordance with the Special APR program that prohibits markup, or to channel the customer toward standard rate financing and perhaps accord her a cash rebate (thereby presenting the customer with a clear choice). Next, if the customer has chosen the standard rate financing, she will again be exposed to dealer subjectivity when the dealer uses his discretion to determine whether and how much to mark up the customer's buy rate by levying a non-risk-related finance charge to establish her contract APR, unbeknownst to her. Plaintiffs and their experts posit that even customers who finance under Special APR programs should be considered part of the class because all customers have the potential for a finance charge markup. (Docket No. 574 at 4.) However, only those who are channeled to standard rate financing, or were only ever eligible to finance according to the standard rate plan, could ever be marked up or have the potential to be affected by dealer subjectivity in the second instance. Eligible customers who finance under special rate contracts that prohibit markup are not truly "subject to" finance charge markup because they will never be exposed to the second layer of dealer discretion, which must occur before any

markup could be applied. Although the choice between the Special APR program and standard rate financing (perhaps plus cash rebate) may involve a kind of subjectivity, it is not the kind of subjectivity that is at the core of plaintiffs' class claim: "[E]ach class member alleges that s/he was impacted by GMAC's policy as a result of GMAC allowing dealers the discretion to covertly and subjectively charge the class members contract rates that had been marked up over and above the risk-based rate assessed by GMAC through its highly automated credit pricing system." (Docket No. 538 at 25.) Those who finance under Special APR programs that prohibit markup are not subject to the same specific policy that is generally applicable to the class as plaintiffs have otherwise pled it. Where a buy rate is not susceptible to being marked up by the dealer (as seems to be the case for those who financed under special rate contracts), then those who financed under special rate contracts are not susceptible to injury by the addition of discretionary markup—the core of plaintiffs' challenge. Moreover, those who financed under a Special Rate Program by choosing the cash rebate and standard financing option are already captured within the class, because, being under the standard rate plan, they would be susceptible to the addition of discretionary markup.

Moreover, the named plaintiffs would not have the requisite Rule 23(a)(3) typicality to represent this claim. Plaintiffs have not alleged that they were eligible for Special Rate Programs, that they financed pursuant to special rate contracts, or that they were steered to standard financing. Therefore, proof of their claims will not advance the claims of any potential class members who financed under special rate contracts, who would object to the first layer of dealer subjectivity, but were not finally subject to the second layer of discretionary markup. As the Sixth Circuit stated in *Senter:* "as goes the claim of the named plaintiff, so go the claims of the class." *Sprague*, 133 F.3d at 399. Proving the plaintiffs' case would do nothing for class members who financed under special rate contracts that prohibited markup. Thus, those who financed under special rate contracts that prohibited mark-up, whether offered by General Motors Corporation or GMAC, do not belong in this class action.

## V. Whether the Statute of Limitations Is a Bar to Class Certification

ECOA provides that no action shall be brought alleging a violation of the Act "later than two years from the date of the occurrence of the violation." 15 U.S.C. § 1691e(f) (2003). Defendants argue that the ECOA's statute of limitations precludes class treatment of this claim, since the triggering date for accrual purposes is the allegedly discriminatory action (here, the date on which the purported class member entered into the contract), and each of the named plaintiffs entered into their contract more than two years before the date the Seventh Amended Complaint was filed on September 17, 2002. (Docket No. 550 at 28.)

Defendants rely on *Andrews v. Orr* for the proposition that the pendency of a previously filed class action may not toll the limitations period for additional class actions by putative members of the original class. *See Andrews v. Orr*, 851 F.2d 146, 149 (6th Cir.1988). Relying on this argument, the defendants mischaracterize the present action as an "additional class action" rather than the mere continuance of a previously filed one.

Under the doctrine announced by the Supreme Court in *American Pipe & Construction Company v. Utah*, "the commencement of the original class action suit tolls the running of the statute for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." *American Pipe & Construction Company v. Utah*, 414 U.S. 538, 553, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). In *Crown, Cork & Seal Co. v. Parker*, the Court extended this doctrine to include individual members of the putative class, such that the statute of limitations is tolled as of the commencement of the suit as to all asserted members of the class who seek not only to intervene after denial of class certification, but also to file individual actions after class status has been denied: "[o]nce the statute of limitations has

been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits or intervene as plaintiffs in the pending action." *See Crown, Cork & Seal Co. v. Parker,* 462 U.S. 345, 353–54, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983). In *Andrews,* the Sixth Circuit endorsed the view of other circuits that, once class certification has been *denied,* although putative class members may file individual suits or intervene as plaintiffs in the pending litigation, they may not take advantage of the *American Pipe* tolling rule to file *additional* class suits. *Andrews,* 851 F.2d at 149. The Court sought to avoid the potential abuse of the *American Pipe* tolling rule, under which abusive parties might seek to "piggyback" one class action onto another, thereby tolling the statute of limitations indefinitely in order essentially to refine a previously-denied class action. *See id.* at 149; *see also Korwek v. Hunt,* 827 F.2d 874, 879 (2d Cir.1987); *Salazar–Calderon v. Presidio Valley Farmers Ass'n,* 765 F.2d 1334, 1351 (5th Cir.1985), *cert. denied* 475 U.S. 1035, 106 S.Ct. 1245, 89 L.Ed.2d 353 (1986); *Robbin v. Fluor Corp.,* 835 F.2d 213, 214 (9th Cir.1987).

The defendant's reliance on *Andrews* in the instant case is misplaced, because class certification has not been denied. After being granted by this court, class certification was vacated by the Sixth Circuit in *Coleman. Coleman,* 296 F.3d at 450. Furthermore, the present motion for class certification is not an additional or new class action, but merely the continuation of the original class action. The defendant relies on *Fleck v. Cablevision VII, Inc.* for the proposition that the distinction between the filing of an amended complaint in the original action and the filing of a new action is irrelevant for tolling purposes because "[t]he potential for abuse is the same whichever procedure is used to renew the motion for class certification through the use of a new class representative." *Fleck v. Cablevision VII, Inc.,* 807 F.Supp. 824, 827 (D.D.C.1992). Defendant's reliance on *Fleck* is unavailing, because in *Fleck,* the district court denied class certification, then allowed an admittedly time-barred, new class representative to amend the original complaint to add herself as a class plaintiff. *Fleck* is more

akin to the situation contemplated in *Andrews*—where certification is denied and then an additional class claim attempts to piggyback onto the original tolling of the statute of limitations—than to the facts of the instant case. The factual scenario at bar is more similar to the case of *Lawrence v. Philip Morris Co.,* wherein, after class certification, while the defendants were seeking a writ of mandamus to force withdrawal of the class certification, an individual class member sought to intervene as an additional class representative to broaden and bolster the class. *Lawrence v. Philip Morris Co.,* No. 94–CV–1494 JG, 1999 WL 51845, at *1 (E.D.N.Y. Jan. 9, 1997). The *Lawrence* court rebuffed a challenge similar to GMAC's based on cases in the *Andrews* line, distinguishing its facts from those cases since class certification was not denied and the case in which the class member sought to intervene was not a subsequent action, but the pending one. *Id.* at *3.

Here, as in *Lawrence,* plaintiffs' actions do not threaten the abuse with which *Andrews* was concerned—the piggybacking of a subsequent class action onto the statute of limitations of an earlier, disfavored one. Because class certification has never been denied in the instant case (which is not an additional class action but the pending one), the statute of limitations remains tolled as to putative members of the original class action, and class certification is not barred on statute of limitations grounds.

The defendant also reasserts its argument, raised in its memorandum of law in support of its motion to dismiss it from the Seventh Amended Class Action Complaint, (Docket No. 470 at 6), that the doctrines of fraudulent concealment and the federal discovery rule, which the court has previously found render plaintiffs' claims back to 1989 timely, are irrelevant where the plaintiffs seek only declaratory and injunctive relief. The court reiterates that, because plaintiffs have alleged that GMAC instituted discriminatory credit practices in 1989 that continue to this day, if the jury so finds, those plaintiffs whose rights under the ECOA were violated in 1989 are no less entitled to a declaration to that effect and an injunction prohibiting

GMAC from discriminating against them again. (See Docket No. 497 at 9.) Moreover, to the extent that facts adduced in the summary judgment briefs affect this court's assessment of the applicability of these tolling doctrines, they will be re-examined in the summary judgment stage.

## VI. Class Definition

In its Seventh Amended Class Action Complaint, the plaintiffs define the putative class as follows: "All black consumers who obtained non-recourse financing from GMAC in the United States pursuant to GMAC's 'Retail Plan—Without Recourse' between May 10, 1989 and the date of judgment." (Docket No. 437 ¶ 130.) This definition contemplates a nationwide class. A nationwide class is a departure from the class that the plaintiffs initially sought and that was certified by this court prior to the Sixth Circuit's reversal and remand—the class was initially defined to include only those African–Americans who obtained financing from GMAC in *Tennessee* pursuant to GMAC's "Retail Plan—Without Recourse."

The Supreme Court in *Califano* stated that the certification of a nationwide class is committed in the first instance to the discretion of the district court. *Califano,* 442 U.S. at 703, 99 S.Ct. 2545. The court is not bound by any specific dictates of Rule 23 on this point, since nothing in that rule limits the geographical scope of a class action. *Id.* at 702, 99 S.Ct. 2545. A class to be certified under Rule 23(b)(2) might be more readily certified as a nationwide class, since the limitations on class size that attend Rule 23(b)(3) class actions do not apply directly. *See id.* The Supreme Court has observed that a nationwide class is not "inconsistent with principles of equity jurisprudence, since the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Id.* Furthermore, the Court in *Califano* noted that, if a class action is otherwise proper, the fact that a class is nationwide "does not necessarily mean that the relief afforded the plaintiffs will be more burdensome than necessary to redress the complaining parties." *Id.*

Because it may be preferable to allow several courts to consider a given class claim in order to benefit from adjudication in different courts in different factual contexts, the Supreme Court has cautioned that a district court considering certification of a nationwide class should ensure that nationwide relief is appropriate in the case before it and that certification would not improperly interfere with litigation of similar issues in other judicial districts. *Id.* The plaintiffs' case properly qualifies for nationwide class certification. Because the plaintiffs seek only declaratory and injunctive relief and to certify the class under Rule 23(b)(2), the limitations on class size that might have inured if they had sought certification under Rule 23(b)(3) (or even when they sought compensatory damages in their earlier bid for certification) are not implicated. They seek declaratory and injunctive relief to redress the alleged violation of the ECOA, a federal law, by a GMAC policy that they contend is operative on a nationwide basis. If they are able to establish that GMAC has perpetuated such a violation on a national scale, then nationwide relief would be justified. Although the court is aware that there have been ECOA challenges to this aspect of many auto financing companies' policies in other state and federal courts, neither the plaintiffs nor the defendant has made the court aware that adjudication of this issue on a nationwide basis would improperly interfere with litigation of similar issues in other judicial districts. Accordingly, certifying a nationwide class in this case is appropriate.

The court notes that this certification could adversely affect the plaintiffs' agency theory of liability because it is based on common law agency principles, which differ from state to state. Because the plaintiffs' claim is based on a federal statute—the ECOA—conflicts of state law are not implicated with respect to plaintiffs' claim under the ECOA. However, the agency theory is susceptible to state law variations which could prove overwhelming of the theory and unsuitable for class adjudication.

The court in its earlier discussion of the statute of limitations rejected the defendant's argument that the statute of limitations bars

plaintiffs from pursuing class claims after certification is vacated. The defendant further argues that, even if the statute of limitations is tolled by the previously-filed complaints in this case, such tolling may not be applied to members of the proposed class whose transactions occurred outside of Tennessee, since the *American Pipe* rule allows tolling only as to asserted members of the original putative class, which in this case was limited to African–American consumers who obtained non-recourse financing from GMAC in Tennessee. (Docket No. 550 at 29.) Plaintiffs argue that GMAC's statute of limitations defense relates to plaintiffs' right to recover individually, not to whether GMAC is liable for the discriminatory impact of its markup policy. (Docket No. 574 at 11.) In fact, the defining dates of the class are not tied to the execution of Coleman's contract (i.e., the alleged moment of the ECOA violation). Rather, according to the plaintiffs, May 10, 1989 was the date that GMAC began using a tier-based financing system and presumably also the finance charge markup policy, as stated in an earlier version of the class complaint. (Docket No. 216, Third Amended Complaint ¶ 32.b.) Because this date is not tied to the statute of limitations, but allegedly to the introduction of the challenged policy, this date should govern the nationwide claims as well. The court notes, however, that the Seventh Amended Class Action Complaint neglects to specify May 10, 1989 as being the date of the introduction of GMAC's risk-based financing system. Instead, the Seventh Amended Class Action Complaint merely states: "In 1989, GMAC began using its MAPS system to assign GMAC applicants into risk tiers." (Docket No. 437 ¶ 43.) The court reserves the option to refine the class definition if it becomes clear that this date is no longer accurate, or as a result of other arguments regarding the statute of limitations made at the summary judgment stage.

Accordingly, for these reasons and the reasons outlined in the analyses above, the court certifies a class under Rule 23(b)(2), for declaratory and injunctive relief only. The class shall be defined as follows: "All black consumers who obtained non-recourse financing from GMAC in the United States pursu-

ant to GMAC's 'Retail Plan—Without Recourse' between May 10, 1989 and the date of judgment; excluding black consumers who obtained such financing under special rate contracts for which markup is prohibited, pursuant to one of General Motors Corporation's or GMAC's Special Rate Programs."

## VIII. Rule 23(g) Appointment of Class Counsel

In accordance with amended Rule 23(c)(1)(B) and new Rule 23(g), effective December 1, 2003, a court certifying a class must appoint class counsel. Fed.R.Civ.P. 23(c)(1)(B), 23(g). The new Rule 23(g) provides:

(g) Class Counsel.

(1) Appointing Class Counsel.

(A) Unless a statute provides otherwise, a court that certifies a class must appoint class counsel.

(B) An attorney appointed to serve as class counsel must fairly and adequately represent the interests of the class.

(C) In appointing class counsel, the court

(i) must consider:

• the work counsel has done in identifying or investigating potential claims in the action,

• counsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action,

• counsel's knowledge of the applicable law, and

• the resources counsel will commit to representing the class;

(ii) may consider any other matter pertinent to counsel's ability to fairly and adequately represent the interests of the class;

(iii) may direct potential class counsel to provide information on any subject pertinent to the appointment and to propose terms for attorney fees and nontaxable costs; and

(iv) may make further orders in connection with the appointment.

(2) Appointment Procedure.

(A) The court may designate interim counsel to act on behalf of the putative class before determining whether to certify the action as a class action.

(B) When there is one applicant for appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under Rule 23(g)(1)(B) and (C). If more than one adequate applicant seeks appointment as class counsel, the court must appoint the applicant best able to represent the interests of the class.

(C) The order appointing class counsel may include provisions about the award of attorney fees or nontaxable costs under Rule 23(h).

Fed.R.Civ.P. 23(g). The Advisory Committee's Note to this new rule makes clear that the primary responsibility of the class counsel, resulting from an appointment as such, is to represent the best interests of the class. Fed.R.Civ.P. 23(g)(1)(B) Advisory Committee's Note.

The court recognizes that plaintiffs' counsel—Michael E. Terry, Wyman O. Gilmore, Jr., and Clint W. Watkins—have submitted affidavits in conjunction with their initial motion for class certification in support of adequacy of representation issues and other related matters. (Docket Nos. 131, 132, 133.) The court has also received the affidavits of Gary Klein and Stuart T. Rossman of the National Consumer Law Center in connection with the initial motion for class certification. (Docket Nos. 188, 189.) In the current motion for national class certification, plaintiffs' counsel have largely relied on their earlier arguments in support of counsels' adequacy of representation and have made no formal application for Rule 23(g) appointment of class counsel or designated in their memorandum in support of the motion which individual or individuals from among the counsel of record should be appointed class counsel under Rule 23(g). Although the court notes that "the materials submitted in support of the motion for class certification may suffice to justify appointment [of class

counsel] so long as the information described in paragraph g(1)(C) is included," Fed. R.Civ.P. 23(g)(2) Advisory Committee's Note, the court directs plaintiffs' counsel to designate which individual or individuals seek appointment as class counsel, something they have not done.

### *Conclusion*

For the reasons stated herein, plaintiffs' Motion for National Class Certification (Docket No. 537) will be granted, with the noted modifications to the class definition. Plaintiffs' counsel will be directed to designate which individual or individuals seek appointment as class counsel.

An appropriate order will enter.

### *ORDER*

For the reasons expressed in the accompanying Memorandum, the Motion for National Class Certification (Docket No. 537) filed by plaintiffs Addie T. Coleman, William H. Harrison, and James L. Dixon, on behalf of themselves and all others similarly situated, is GRANTED with noted modifications to the proposed class definition. The class is certified under Federal Rule of Civil Procedure 23(b)(2). The class is defined as follows: "All black consumers who obtained non-recourse financing from GMAC in the United States pursuant to GMAC's 'Retail Plan—Without Recourse' between May 10, 1989 and the date of judgment; excluding black consumers who obtained such financing under special rate contracts for which markup is prohibited, pursuant to one of General Motors Corporation's or GMAC's Special Rate Programs." The class claims that General Motors Acceptance Corporation ("GMAC") has established a finance charge markup policy which, although facially neutral, authorizes the imposition of purely subjective finance charges on black GMAC credit applicants to discriminatory effect, in violation of the Equal Credit Opportunity Act, 15 U.S.C. § 1691 *et seq.*

Plaintiffs' counsel are **ORDERED** to designate in writing which individual or individuals seek appointment as class counsel, in accordance with Federal Rule of Civil Proce-

dure 12(g), by close of business on January 16, 2004.

It is so ordered.